FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
9:42 am, Oct 06, 2026
JEFFREY P. COLWELL, CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. ________________________________

Amber Doe, Plaintiff

v.

Jury Trial requested:
(please check one)
__X_ Yes ___ No

Sequoia Capital Operations LLC ,

Sequoia Capital Fund, L.P.

Sequoia Capital Fund Feeder, L.P.

Sequoia Capital US/E Seed V Principals Fund (Q), L.P.

Sequoia Capital US/E Seed V Principals Fund, L.P.

Sequoia Capital US/E Venture XVIII Principals Fund, L.P.

Sequoia Capital US/E Venture XVIII Principals Fund (Q), L.P.

Sequoia Capital US/E Growth X Principals Fund, L.P.

Sequoia Capital US/E Expansion I Principals Fund, L.P.

Sequoia Capital US/E Venture Partners Fund XVIII, L.P.

Sequoia Capital US/E Growth Partners Fund X, L.P.

Sequoia Capital China Expansion I Principals Fund, L.P.

Sequoia Capital US/E Seed Partners Fund IV, L.P.

Sequoia Capital U.S. Venture Partners Fund XVII, L.P.

Sequoia Capital Global Growth Fund III - Endurance Partners Principals Fund, L.P.

Sequoia Capital US/E Seed IV Principals Fund, L.P.

Sequoia Capital U.S. Venture XVII Principals Fund, L.P.

Sequoia Capital U.S. Growth IX Principals Fund, L.P.

Sequoia Capital Global Growth Fund III - U.S. India Annex Principals Fund, L.P.

Sequoia Capital Global Growth Fund III - U.S. India Annex Fund, L.P.

Sequoia Capital Global Growth Fund III - Endurance Partners, L.P.

Sequoia Capital U.S. Venture Fund XVII, L.P.

Sequoia Capital U.S. Growth Fund IX, L.P.

Sequoia Capital US/E Seed Fund IV, L.P.

Sequoia Capital U.S. Growth Partners Fund IX, L.P.

Sequoia Capital U.S. Growth VIII Principals Fund, L.P.

Sequoia Capital U.S. Growth Partners Fund VIII, L.P.

Sequoia Capital U.S. Scout Seed Principals Fund III, L.P.

Sequoia Capital U.S. Growth Fund VIII, L.P.

Sequoia Capital U.S. Venture Fund XIV, L.P.

Sequoia Capital U.S. Growth Fund VII, L.P.

Sequoia Capital U.S. Growth Fund VI, L.P.

Sequoia Capital Global Growth Fund, L.P.

Sequoia Capital U.S. Growth Fund V, L.P.

Sequoia Capital U.S. Venture 2010 Fund, L.P.

Sequoia Capital Franchise Partners, L.P.

Sequoia Capital IX, L.P.

Sequoia Entrepreneurs Annex Fund, L.P.

Sequoia Capital Growth III Principals Fund, LLC

Sequoia Capital Franchise Fund, L.P.

Sequoia Capital Growth Partners III, L.P.

Sequoia Capital Growth Fund III, L.P.

Does 1-100 Et Al

(*List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.*)

---

COMPLAINT

NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.

**A.** PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

*AMBER DOE*

*# 1001 421 8th Ave, New York, NY 10001*

(Name and complete mailing address)

*Phone : 646-332-6339 Email* amberslitigation@gmail.com
(Telephone number and e-mail address)

B. DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Sequoia Capital Operations LLC
2800 Sand Hill Road, Suite 101
Menlo Park, California 94025
Phone: (650) 854-3927

Sequoia Capital Operations, LLC (and affiliated Sequoia entities)
Headquarters:
2800 Sand Hill Road, Suite 101, Menlo Park, CA 94025, USA
List of Sequoia Capital Fund Entities:

1. Sequoia Capital Fund, L.P.
2. Sequoia Capital Fund Feeder, L.P.
3. Sequoia Capital US/E Seed V Principals Fund (Q), L.P.
4. Sequoia Capital US/E Seed V Principals Fund, L.P.
5. Sequoia Capital US/E Venture XVIII Principals Fund, L.P.
6. Sequoia Capital US/E Venture XVIII Principals Fund (Q), L.P.
7. Sequoia Capital US/E Growth X Principals Fund, L.P.
8. Sequoia Capital US/E Expansion I Principals Fund, L.P.
9. Sequoia Capital US/E Venture Partners Fund XVIII, L.P.
10. Sequoia Capital US/E Growth Partners Fund X, L.P.
11. Sequoia Capital China Expansion I Principals Fund, L.P.

**12.** Sequoia Capital US/E Seed Partners Fund IV, L.P.

**13.** Sequoia Capital U.S. Venture Partners Fund XVII, L.P.

**14.** Sequoia Capital Global Growth Fund III - Endurance Partners Principals Fund, L.P.

**15.** Sequoia Capital US/E Seed IV Principals Fund, L.P.

**16.** Sequoia Capital U.S. Venture XVII Principals Fund, L.P.

**17.** Sequoia Capital U.S. Growth IX Principals Fund, L.P.

**18.** Sequoia Capital Global Growth Fund III - U.S. India Annex Principals Fund, L.P.

**19.** Sequoia Capital Global Growth Fund III - U.S. India Annex Fund, L.P.

**20.** Sequoia Capital Global Growth Fund III - Endurance Partners, L.P.

**21.** Sequoia Capital U.S. Venture Fund XVII, L.P.

**22.** Sequoia Capital U.S. Growth Fund IX, L.P.

**23.** Sequoia Capital US/E Seed Fund IV, L.P.

**24.** Sequoia Capital U.S. Growth Partners Fund IX, L.P.

**25.** Sequoia Capital U.S. Growth VIII Principals Fund, L.P.

**26.** Sequoia Capital U.S. Growth Partners Fund VIII, L.P.

**27.** Sequoia Capital U.S. Scout Seed Principals Fund III, L.P.

**28.** Sequoia Capital U.S. Growth Fund VIII, L.P.

**29.** Sequoia Capital U.S. Venture Fund XIV, L.P.

**30.** Sequoia Capital U.S. Growth Fund VII, L.P.

**31.** Sequoia Capital U.S. Growth Fund VI, L.P.

**32.** Sequoia Capital Global Growth Fund, L.P.

**33.** Sequoia Capital U.S. Growth Fund V, L.P.

**34.** Sequoia Capital U.S. Venture 2010 Fund, L.P.

Defendants Sequoia Capital Operations, LLC and its affiliated entities listed in the caption are collectively referred to herein as "Defendants" or "Sequoia Capital," except where otherwise specified.

## Service & Jurisdiction Notes

Service of Process:
Defendant Sequoia Capital Operations, LLC may be served at its principal place of business located at:
2800 Sand Hill Road, Suite 101, Menlo Park, California 94025, USA.

This address is the principal office associated with Sequoia Capital Operations, LLC and related Sequoia-affiliated entities, as reflected in publicly available filings and business records. Service at this location is reasonably calculated to provide actual notice to Defendant.

Colorado Jurisdiction:
This Court has personal jurisdiction over Defendant pursuant to Colorado Revised Statutes § 13-1-124, because Defendant has purposefully directed business activities toward the State of Colorado and has established sufficient minimum contacts with the forum.

Defendant's contacts with Colorado include, but are not limited to:

- investments in Colorado-based companies and business ventures;
- active participation in the management, oversight, and strategic direction of Colorado-based portfolio companies;
- negotiation, execution, and performance of transactions and agreements involving Colorado-based entities;
- engagement in ongoing interstate commerce affecting Colorado residents and businesses.

These activities constitute the transaction of business within Colorado and demonstrate that Defendant has purposefully availed itself of the privilege of conducting activities in this State.

Plaintiff's claims arise out of, or relate to, Defendant's conduct and coordinated activities, including those directed into Colorado. The exercise of jurisdiction is therefore consistent with traditional notions of fair play and substantial justice.

C. JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__X__ Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

Venue is proper and necessary in each district where the Plaintiff was trafficked, where any predicate act of the RICO enterprise occurred, or where Defendants reside or maintain operations. Proper jurisdictions include but are not limited to: COLORADO, CALIFORNIA, LOUISIANA, SDNY, EDNY, NJ, PA,KY NDCA, SDFL, NDTX, SDTX, DC, DVI, SDFL, NDFL, DOR CANADA, EUROPE, JAPAN, CHINA GUAM, PUERTO RICO.

14. Jurisdiction is also established under:

- 18 U.S.C. § 1595 (civil remedies for trafficking victims)
- 18 U.S.C. § 1965 (RICO venue and process)
- 28 U.S.C. §§ 1331, 1343, 1350 (federal question, civil rights, and alien tort)
- 28 U.S.C. §§ 1391, 1404, 1406 (venue and transfer statutes)
- Fed. R. Civ. P. 15 and Fed. R. Civ. P. 20 (joinder and amendment)

15. Plaintiff reserves the right to amend, sever, or transfer this Complaint to any and all federal districts where the enterprise operated, and where harm was inflicted, so as to secure a neutral forum untainted by judicial corruption and collusion.

# A. Subject Matter Jurisdiction

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the Trafficking Victims Protection Act

("TVPA"), 18 U.S.C. §§ 1581–1595, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

Plaintiff asserts claims under 18 U.S.C. § 1595, which provides a civil cause of action for victims of trafficking against any person or entity that knowingly benefits from participation in a trafficking venture.

This Court also has jurisdiction under 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Canada and Defendant Sequoia Capital Operations, LLC is a citizen of the United States, and the amount in controversy exceeds $75,000.

To the extent Plaintiff asserts related state-law claims arising from the same nucleus of operative facts, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

## B. Personal Jurisdiction

This Court has personal jurisdiction over Defendant Sequoia Capital Operations, LLC because Defendant conducts substantial business within the United States and purposefully directs commercial, financial, and enterprise activities affecting this District.

At all relevant times, Sequoia Capital and its senior partners, including Michael Goguen, conducted business activities connected to Colorado, including commercial relationships, financial transactions, investment activities, and enterprise conduct linked to the Colorado corridor.

Through these activities, Defendant purposefully availed itself of the benefits, protections, and commercial opportunities provided by this forum.

Defendant's actions were not isolated or incidental. Rather, Defendant's partners, agents, and affiliates engaged in continuous and systematic activities tied to the Colorado economy, hospitality industry, travel infrastructure, and financial systems.

## C. Venue

Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) and § 1391(b)(2).

Venue is proper under §1391(b)(1) because Defendant conducts business and is subject to personal jurisdiction in this District.

Venue is also proper under §1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

Plaintiff alleges that she was trafficked, coerced, and subjected to exploitation and retaliatory conduct in locations including Denver, Boulder, Aspen, and surrounding areas of Colorado.

These acts involved the use of hospitality venues, transportation infrastructure, financial channels, and other facilities within this District to facilitate exploitation, conceal trafficking activity, and maintain control over Plaintiff.

The Denver metropolitan region and the broader Colorado mountain corridor functioned as a logistical and financial hub for the trafficking venture, including activity associated with Denver International Airport, luxury resort properties, hospitality venues, and financial institutions operating in Colorado.

At all relevant times, Michael Goguen was a senior partner of Sequoia Capital Operations, LLC. Plaintiff alleges that Goguen used the authority, wealth, resources, and institutional infrastructure associated with his position at Sequoia Capital to facilitate acts of coercion, trafficking, and exploitation affecting Plaintiff in Colorado and other jurisdictions.

Plaintiff further alleges that the trafficking venture and related enterprise activities involved commercial travel, hospitality venues, financial transactions, and other instrumentalities located in Colorado, including activity occurring in Denver, Aspen, Boulder, and surrounding areas.

Defendant Sequoia Capital, through its partners and agents, maintained business connections and commercial relationships tied to the Colorado corridor, including interactions with financial institutions, hospitality venues, investment channels, and travel infrastructure located in this District.

These acts were undertaken in furtherance of the trafficking venture from which Defendant Sequoia Capital knowingly benefited.

Accordingly, Colorado constitutes a substantial locus of enterprise activity, trafficking conduct, and commercial activity associated with Defendant, rendering venue proper under 28 U.S.C. § 1391.

## D. STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each*

*claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

Amber DOE
(A Canadian citizen of American Ancestors and survivor of cross-border human trafficking, sexual slavery, and judicial persecution),

Plaintiff,

v.

SEQUOIA CAPITAL OPERATIONS, LLC,
Defendants. ET AL

## PRELIMINARY STATEMENT

## IMMINENT AND IRREPARABLE HARM

## I.

Plaintiff Amber Doe brings this action against Sequoia Capital Operations, LLC because the violence inflicted upon her did not begin and end with a rogue individual acting in isolation. It was enabled, protected, prolonged, and later obscured by institutional power. Michael Goguen, Sequoia's former partner, used the wealth, influence, access, and protection associated with his role to abuse, exploit, and traffic Plaintiff. After Plaintiff attempted to escape, survive, and seek redress, Sequoia, through its retained lawyers and agents, participated in an extended campaign of coercion, intimidation, retaliation, and legal attrition designed to silence her permanently.

Since the filing of her case for relief from human trafficking Plaintiff's repeated requests for emergency relief, judicial delay and inaction have exposed Plaintiff to renewed danger. Plaintiff

alleges that the same machinery that once controlled her through sexual exploitation now seeks to control her through fear, exhaustion, procedural foreclosure, reputational destruction, and the threat of unlawful detention. The danger is not abstract. Plaintiff alleges that the foreseeable consequence of continued inaction is renewed abuse, further deprivation of liberty, and severe physical and psychological harm.

Plaintiff is a survivor of prolonged child sex trafficking, coercive exploitation, sexual violence, and forced compliance. She alleges that she was subjected to systematic control for the benefit of wealthy and powerful men, and that when she later attempted to assert her rights, the response was not protection but containment. The methods changed form but not function. What had once been enforced through direct violence was later enforced through lawyers, fraudulent agreements, intimidation, surveillance, retaliatory litigation, and procedural obstruction.

This case therefore concerns more than past abuse. It concerns the ongoing use of corporate and legal power to preserve the fruits of abuse and prevent exposure of those responsible. Plaintiff alleges that Sequoia did not merely employ Goguen. It benefited from his status and protected the ecosystem around him. Plaintiff further alleges that Sequoia's retained counsel, including lawyers associated with Quinn Emanuel, Wilson Sonsini, and Goodwin Procter, were used over a period of years to isolate Plaintiff, force her into silence, break her access to remedies, and make pursuit of justice personally dangerous.

Dismissal of this action would not be a neutral procedural event. Plaintiff alleges that dismissal would function as another act in the same continuum of coercion that has already deprived her of safety, dignity, resources, and meaningful access to justice. Plaintiff therefore seeks adjudication on the merits, not as a matter of rhetoric, but because the practical consequences of further foreclosure are grave.

CLOSED-LOOP PROCEDURAL FORECLOSURE AND DENIAL OF AN EFFECTIVE REMEDY

Plaintiff further alleges that her attempts to obtain relief have repeatedly been diverted, narrowed, dismissed, or procedurally foreclosed in ways that prevented any meaningful testing of the underlying facts. Across multiple courts and venues, Plaintiff has encountered a pattern in which claims are terminated before discovery, before evidence is heard, and before the merits are reached. Plaintiff does not plead this history to relitigate every prior case in this action, but to explain the ongoing harm, the urgency of relief, and the way in which legal process itself has been used as an instrument of attrition.

As relevant here, Plaintiff alleges that Sequoia and those acting for its benefit have used litigation, counsel, procedural pressure, and repeated defensive maneuvering to ensure that Plaintiff remains trapped in a cycle where abuse is never squarely adjudicated, while the consequences of speaking continue to intensify. The result is not merely delay. It is the practical denial of an effective remedy.

On April 6, 2026, Plaintiff filed a new federal action in the Southern District of New York asserting substantially expanded claims concerning trafficking, racketeering, retaliation, abuse of legal process, and constitutional violations. Despite the existence of substantial New York contacts involving Sequoia Capital Operations, LLC and related enterprise actors, Chief Judge Laura Taylor Swain assigned the matter to herself and again transferred the case to the Central District of California.

At the time of transfer, Plaintiff had already demonstrated that the Central District of California was not a neutral forum. Plaintiff alleges that Judge Maame Ewusi-Mensah Frimpong had previously entered an expansive vexatious-litigant order purporting to permanently bar Plaintiff from filing actions in the Central District relating to Defendant Michael Goguen, affiliated entities, counsel, or substantially related subject matter. Plaintiff contends that the transfer therefore operated as a functional termination of all access to federal adjudication.

Plaintiff further alleges that, in the April 2026 action, Defendants including Sequoia Capital were personally served with summons and process prior to the requested stay proceedings, establishing active jurisdiction before any attempted transfer or dismissal.

In addition to the April 14, 2026 transfer order presently under appeal, Plaintiff further alleges that a related Southern District of New York action, Doe v. Sequoia Capital Operations LLC, Case No. 26-cv-03205-JMF, was transferred by Judge Jesse M. Furman to the Central District of California. Plaintiff alleges that this related transfer followed the same pattern of jurisdictional displacement previously initiated by Chief Judge Laura Taylor Swain, and that it further demonstrates a coordinated pattern of routing Plaintiff's trafficking, civil-rights, and constitutional claims into the same California forum where prior filing restrictions and retaliatory rulings operate to foreclose meaningful adjudication.

Because the Central District transfer would again place Plaintiff into a forum where prior judicial orders allegedly preclude meaningful access to the courts, Plaintiff contends the April 2026 transfer constitutes continuing judicial refoulement, ongoing denial of due process, and irreparable deprivation of access to a neutral tribunal.

Plaintiff's resolve remains grounded in lived reality. She survived prolonged coercion, violence, exploitation, and threats. She now alleges that the corporate and legal afterlife of that abuse has been designed to produce the same end by different means: silence, exhaustion, and disappearance from public scrutiny. This Court should therefore understand the present action not as a sprawling moral manifesto, but as a direct action against Sequoia Capital for its role in enabling abuse, benefiting from a trafficking venture, and extending coercive control through institutional force after Plaintiff sought freedom.

The above-stated facts represent approximately fifteen percent of the known felonious conduct perpetrated by Defendants and their agents. Plaintiff reserves the right to supplement these facts as discovery proceeds. All named Defendants are subject to joint and several liability, including

vicarious liability for the actions of their agents, employees, and co-conspirators under TVPRA, RICO, § 1983, and common law conspiracy doctrines.

ADDITIONAL FACTUAL ALLEGATIONS: 2026 NEW YORK FILINGS, REPEATED TRANSFERS, AND CONTINUING INJURY

A1. Plaintiff incorporates all preceding allegations without withdrawing, replacing, or limiting any of them. These additional allegations concern her renewed efforts to obtain judicial protection in 2026 and the continuing physical, psychological, financial, and personal injuries she attributes to Defendants' conduct and the judicial actions described in this complaint.

A2. In 2026, Plaintiff again filed litigation in the United States District Court for the Southern District of New York and paid the required filing fees. Plaintiff incurred this expense to obtain a meaningful hearing on her trafficking, abuse, exploitation, injury, and related claims. She alleges that payment of the fees and commencement of proceedings nevertheless failed to secure an opportunity to present those claims to a neutral tribunal for adjudication on their merits.

A3. Plaintiff alleges that Laura Taylor Swain caused her New York litigation to be transferred back to the Central District of California, where it was routed back to Judge Maame Ewusi-Mensah Frimpong. Plaintiff also relies on the separate transfer involving Judge Jesse M. Furman already alleged above. Plaintiff alleges that these transfers perpetuate a recurring funnel method: wherever she seeks relief, the proceedings return to the same judge and the same restrictive rulings that she contends have foreclosed meaningful access to justice.

A4. Plaintiff alleges that this funnel method is an instrument of corruption and procedural foreclosure. In Plaintiff's account, all roads lead back to Judge Frimpong, whom Plaintiff alleges is corrupt and has invoked judicial immunity as protection against accountability for criminal conduct and judicial misconduct committed from the federal bench. Plaintiff alleges that Frimpong's rulings have been invoked as though Plaintiff possesses no enforceable legal rights against anyone who participated in her child sex trafficking, abuse, exploitation, rape, physical injuries, or broken bones, or against lawyers whom she alleges embezzled her money and defrauded the courts. Plaintiff challenges both the breadth attributed to those rulings and their use to prevent consideration of claims against the persons and entities alleged to be responsible.

A5. Plaintiff alleges that the repeated transfers, filing restrictions, dismissals, and refusals to provide protection continue to damage her. She has expended additional funds and effort seeking relief while the underlying danger and deprivation remain unresolved. She alleges that this cycle has prolonged her exposure to abuse, depleted the resources needed for survival, aggravated her trauma, and prevented meaningful redress for the injuries described throughout this complaint.

A6. Approximately one year before these additional allegations, Plaintiff filed a motion for injunctive relief in federal court in Colorado, seeking protection from the continuing conduct described in this complaint. Plaintiff alleges that the judges involved in those proceedings acted in concert with Defendant and Quinn Emanuel lawyers to obstruct that relief and preserve the conditions under which the abuse and deprivation continued. Plaintiff pleads this coordination as an allegation concerning the events described in this complaint, not as an adjudicated finding of conspiracy.

A7. Plaintiff alleges that the wilful and wanton misconduct of more than one hundred state and federal judges has contributed to conditions in which she now lives in her car and has no access to the medical treatment she needs. She alleges that the loss of effective judicial protection and the continuing deprivation of her resources have impaired her ability to obtain safe housing and necessary care. Her prior physical injuries, including broken bones, remain part of the continuing harm for which she seeks relief. Plaintiff alleges that these conditions compound her complex post-traumatic stress and the effects of the trafficking, sexual violence, and exploitation already pleaded.

A8. Plaintiff further alleges that Quinn Emanuel lawyers continue to abuse, intimidate, and retaliate against her through the conduct and proceedings described in this complaint. She alleges that their ongoing use of legal process against her has prolonged the coercion and injury while preventing the underlying trafficking allegations from being heard before an impartial tribunal.

A9. Plaintiff alleges that Judge Nina G. Shapirshteyn signed or caused the issuance of a purported bench warrant for Plaintiff's arrest with no bail, which Plaintiff characterizes as punishment for "criminal defamation of billionaire pedophiles." Plaintiff disputes the warrant's authenticity and legal validity and alleges that it is counterfeit, fraudulent, and retaliatory. She alleges that it arose from the proceedings already described in this complaint, which she challenges as lacking jurisdiction and fundamental procedural fairness. Plaintiff alleges that the continuing threat of arrest and detention without bail intensifies her fear, trauma, and insecurity and further impairs her ability to seek protection and care.

A10. After the disputed warrant, Shapirshteyn left the bench and returned to legal practice. Plaintiff describes that departure as a resignation shortly after the warrant and alleges that Shapirshteyn was then approximately forty-three years old. Public records describe her departure as retirement; the California State Bar records her return to active attorney status on January 1, 2026, and her law firm identifies her as a partner and former Superior Court judge. Plaintiff alleges that the challenged warrant and its harmful consequences remain unresolved despite Shapirshteyn's departure from judicial office.

A11. Plaintiff alleges that she has still never received a meaningful evidentiary hearing on the merits of the trafficking, exploitation, rape, abuse, injuries, and alleged embezzlement claims described in this complaint. This allegation concerns the absence of meaningful adjudication of those claims, notwithstanding the prior proceedings, orders, and purported trials separately

described above. She alleges that the continuing denial of such a hearing leaves her injuries unredressed while Defendants retain the benefits of the challenged conduct.

A12. These continuing injuries support Plaintiff's existing requests for urgent protection, access to necessary treatment and resources, and meaningful adjudication before a neutral tribunal. Plaintiff seeks the declaratory, injunctive, equitable, and other relief already requested in this complaint to the extent legally available. These additional allegations do not withdraw any prior allegation, add a new named defendant, or alter the complaint's existing statement concerning relief sought from judicial officers and state actors.

A13. On information and belief, Plaintiff alleges that Defendant's lead Quinn Emanuel lawyers, Diane Doolittle and Bruce Van Dalsem, were each married to another person at the inception of this case: Van Dalsem to Judge Yvette Van Dalsem, and Doolittle to attorney Michael Frederick Grady. Plaintiff further alleges, on information and belief, that Doolittle and Van Dalsem carried on an extramarital sexual affair for more than a decade and contrived to use Plaintiff's case and the ensuing worldwide litigation as a means of secretly continuing that sexual affair. Plaintiff alleges that her litigation was thereby used to serve their private interests, litigation tourism, furthering the exploitation and abuse of legal process alleged throughout this complaint.

A14. Plaintiff alleges that Doolittle and Van Dalsem orchestrated the first fraudulent bench trial in 2019 before compromised San Mateo County Judge Danny Chou while Plaintiff was incapacitated, after Defendant and Quinn Emanuel had procured the removal of her lawyers through bribery. Plaintiff further alleges, on information and belief, that these same lawyers orchestrated a second fraudulent, quasi-criminal trial in 2025, just weeks before their secret wedding in Lake Tahoe, intending to silence Plaintiff and entrap her into a prison sentence. Plaintiff states that she has never been arrested and has never committed a crime. She alleges that these proceedings weaponized judicial process to punish her for exposing her trafficking, rape, abuse, and judicial misconduct. The alleged extramarital relationship, wedding, private motives, and connection to the litigation are factual contentions pleaded on information and belief and identified as requiring evidentiary support through further investigation or discovery; they are not pleaded as adjudicated findings.

A15. Plaintiff alleges that, when she brought her federal action seeking redress for deprivation of civil rights under color of law, Judge Maame Ewusi-Mensah Frimpong dismissed all of her claims against all Defendants, including Danny Chou, and ordered the sealing of evidence concerning trafficking, abuse, and alleged judicial misconduct. Plaintiff alleges that this evidence concerned matters of substantial public interest. According to Plaintiff's chronology, the dismissal and sealing occurred one month and one day before Chou's June 23, 2023 appellate confirmation and swearing-in. Plaintiff alleges that these actions suppressed scrutiny of her allegations before the public proceedings celebrating his elevation.

A16. The confirmation hearing was conducted by the California Commission on Judicial Appointments, chaired by Chief Justice Patricia Guerrero, with Attorney General Rob Bonta and

Presiding Justice Jim Humes serving as the other voting members. According to the supplied transcript, at approximately 00:24:55–00:25:16, Bonta stated: "full disclosure I am very appropriately biased in support of" Chou, then identified their friendship and their close work together in the San Francisco City Attorney's Office. Bonta further described supporting Chou's appointments to both the trial and appellate benches. At approximately 00:28:01–00:28:13, Bonta identified Chou as his former team leader and asked, jokingly, who had been Chou's favorite supervisee.

A17. At approximately 00:06:11–00:08:43, Judge Jonathan E. Karesh testified in support of Chou's confirmation. Karesh stated that he had served as San Mateo County's presiding judge in 2019 and 2020—the period encompassing Plaintiff's challenged bench trial and resulting decision—and described Chou as one of the court's best judges. He praised Chou's demeanor, represented that lawyers and their clients could expect fair hearings and respectful treatment, and gave Chou his highest recommendation. Plaintiff alleges that these public assurances stood in direct conflict with her experience of the proceedings described in this complaint.

A18. At approximately 00:37:30–00:37:49, Chou expressly thanked his presiding judges, including Jonathan Karesh, Leland Davis, and Elizabeth Lee, for ensuring that he received mentoring and training and for providing opportunities to develop as a judge. Plaintiff alleges that this acknowledgment is relevant to the institutional relationships surrounding the San Mateo proceedings she challenges, including Lee's renewal of the restraining order against her. The transcript establishes Chou's acknowledgment of Lee's support; it does not identify Lee as a witness who testified at the confirmation hearing.

A19. At approximately 00:17:06–00:22:30, Justin Palmer presented the State Bar's Commission on Judicial Nominees Evaluation report, announcing its unanimous rating of Chou as exceptionally well qualified. This evaluation body was distinct from the Commission on Judicial Appointments, which voted on his confirmation. At approximately 00:29:57–00:31:49, Guerrero expressed appreciation for Chou's judicial service and asked about his approach to judging and his anticipated appellate work. Chou described examining facts and law objectively. At approximately 00:31:51–00:32:21, the appointments commission voted unanimously to confirm him. Following a recess, Presiding Justice Teri L. Jackson administered the oath at approximately 00:33:17–00:35:33.

A20. Plaintiff alleges that the contrast between these public endorsements and the treatment of her federal civil-rights claims is material to her allegations of institutional protection and denial of meaningful redress. While Chou's colleagues praised his fairness, judicial temperament, and public service, Plaintiff alleges that her claims against him had been dismissed and the supporting evidence concealed from public scrutiny. Plaintiff relies on the documented relationships and endorsements as context for her allegations of coordinated protection. The asserted purpose behind the dismissal and sealing, and any alleged coordination among the participants, remain Plaintiff's allegations; the ceremony transcript itself does not establish those motives.

A18. Plaintiff alleges that San Mateo Judges Elizabeth Lee, Jonathan E. Karesh, and Danny Chou were all named as Defendants in her federal civil-rights action for their alleged participation in abuse of process and deprivation of her constitutional rights. Plaintiff specifically alleges that Lee extended the restraining order against her, infringing her First Amendment rights and suppressing her ability to speak publicly about Chou's alleged misconduct. Plaintiff further alleges that Karesh participated in the deprivation of her civil rights through the conduct separately described in this complaint. Their roles in the confirmation proceedings therefore bear directly on Plaintiff's allegations: Karesh publicly endorsed Chou's fairness and judicial temperament, while Chou expressly thanked both Karesh and Lee for their mentoring, training, and support. Plaintiff alleges that these public endorsements reinforced the standing of judicial officers whose conduct she had challenged, after her federal claims against them had been dismissed and the supporting evidence allegedly sealed. She contends that the ceremony must be understood in the context of those unresolved allegations and the continuing restrictions on her speech.

https://www.bontafiles.com/



## PARTIES

## II.

Plaintiff Amber Doe is a Canadian citizen and survivor of cross-border trafficking, sexual exploitation, coercive abuse, and prolonged retaliatory legal oppression. She brings this action to obtain relief from Sequoia Capital Operations, LLC for its role in enabling, benefiting from, concealing, and extending the harms inflicted upon her.

Defendant Sequoia Capital Operations, LLC is a business entity organized under the laws of Delaware with its principal place of business in Menlo Park, California. At all relevant times, Sequoia operated through senior partners, officers, agents, employees, affiliates, and retained counsel, and exercised substantial economic and institutional power in the United States.

At all relevant times, Michael Goguen was a senior Sequoia partner whose status, access, wealth, and authority were inseparable from Sequoia's institutional platform. Plaintiff alleges that Goguen used the power and prestige associated with that role to facilitate sexual exploitation, coercion, trafficking, and retaliatory harm against Plaintiff.

Plaintiff further alleges that after Goguen's abuse and exploitation of Plaintiff, Sequoia, acting through retained counsel and other agents, undertook or ratified a prolonged campaign to suppress Plaintiff's claims, isolate her from protection, and prevent meaningful exposure of the underlying abuse.

References in this Complaint to Sequoia include acts undertaken directly by Sequoia, as well as acts undertaken by officers, agents, employees, retained lawyers, investigators, or other persons acting with actual or apparent authority on Sequoia's behalf or for its benefit.

## OVERVIEW OF SEQUOIA'S ROLE IN THE TRAFFICKING VENTURE AND SUBSEQUENT SILENCING

## III.

1. This action is brought against Sequoia Capital Operations, LLC as the corporate entity whose then-senior partner, Michael Lewis Goguen, used the power, prestige, access, wealth, and institutional protection associated with his Sequoia role to facilitate, conceal, and prolong severe exploitation and coercive abuse against Plaintiff.

2. Plaintiff alleges that Goguen did not act as an isolated private wrongdoer detached from institutional power. Rather, he acted with the resources, commercial infrastructure, social authority, and legal shielding associated with Sequoia Capital, and used those tools in ways that directly affected Plaintiff's liberty, safety, bodily autonomy, finances, and access to justice.

3. Plaintiff further alleges that Sequoia Capital knowingly benefited, financially or otherwise, from Goguen's continued status, influence, and enterprise activity, while failing to prevent, stop, disclose, or remedy the harms inflicted upon Plaintiff.

4. Plaintiff also alleges that, after the underlying sexual exploitation and trafficking, the coercive system surrounding Goguen did not end. Instead, it evolved into a prolonged campaign of intimidation, surveillance, legal coercion, reputational destruction, retaliatory litigation, fraudulent process, and procedural sabotage designed to isolate Plaintiff, strip her of remedies, and silence her permanently.

5. According to Plaintiff, this second phase of coercion was carried out, in substantial part, through persons acting on behalf of or for the benefit of Sequoia Capital, including retained lawyers, agents, investigators, corporate affiliates, and other intermediaries who functioned as instruments of concealment, retaliation, and control.

6. Plaintiff alleges that lawyers associated with Quinn Emanuel, Goodwin Procter, and Wilson Sonsini were used as part of this coercive apparatus, including in connection with the May 2014 settlement process, subsequent retaliatory litigation, and efforts to prevent Plaintiff from obtaining meaningful redress.

7. Plaintiff does not plead the chronology below as background alone. She pleads it to show that Sequoia's role was not merely historical, passive, or incidental. Rather, Plaintiff alleges that Sequoia, through its partner and through persons acting for its benefit, participated in a venture that exploited Plaintiff and later extended that exploitation through legal and economic force.

8. The factual chronology that follows therefore sets out the interconnected pattern of trafficking, coercion, concealment, retaliation, and procedural abuse that forms the basis of Plaintiff's claims against Sequoia Capital under federal and related law.

9. To the extent the chronology references the acts of Goguen, lawyers, judges, agents, institutions, or other non-party actors, those facts are pleaded because they bear directly on Sequoia's knowledge, benefit, ratification, concealment, agency relationships, use of intermediaries, and the means by which Plaintiff alleges the trafficking venture and its aftereffects were carried out.

10. Plaintiff incorporates the following detailed Statement of Facts as the operative chronology supporting her claims that Sequoia Capital enabled, benefited from, concealed, and extended the harms inflicted through its then-partner Michael Goguen and those acting on Sequoia's behalf or for its protection.

STATEMENT OF FACTS AND CHRONOLOGY OF TRAFFICKING, COERCION, RETALIATORY LITIGATION, AND PROCEDURAL SABOTAGE

## SEQUOIA CAPITAL LIABILITY

## IV.

1. Michael Goguen's Role at Sequoia

At all relevant times, Michael Lewis Goguen was a senior partner of Defendant Sequoia Capital Operations, LLC, a global venture capital firm headquartered in California with extensive investments and business activities throughout the United States, including in Colorado.

Goguen exercised substantial authority within Sequoia, controlling large investment funds, interacting with portfolio companies, and acting as an agent and representative of the firm.

2. Use of Sequoia Resources

Plaintiff alleges that Goguen used the financial resources, institutional power, and professional infrastructure associated with Sequoia Capital to facilitate conduct giving rise to Plaintiff's claims.

This included:

- the involvement of major law firms historically representing Sequoia or its partners, including Quinn Emanuel, Wilson Sonsini, and Goodwin Procter;
- the drafting and execution of the May 23, 2014 Personal Injury Settlement Agreement by attorneys associated with Goguen and his professional network;
- the use of corporate staff, facilities, and financial channels connected to Sequoia and its partners.

3. Settlement Agreement Executed Through Sequoia-Connected Counsel

The written Settlement Agreement required Goguen to pay Plaintiff $40 million in four installments of $10 million in exchange for Plaintiff's release of claims and confidentiality obligations.

The agreement was prepared and executed with the assistance of attorneys associated with Goguen and his professional network.

Plaintiff alleges that the settlement was executed at or near locations associated with Sequoia Capital and that the negotiation process involved attorneys affiliated with Goguen's business interests.

4. Breach of the Settlement Agreement

Pursuant to the settlement terms:

- the first $10 million installment was paid;
- the remaining installments, due between December 2014 and December 2015, were not paid.

Goguen subsequently repudiated the agreement and refused further performance.

Plaintiff alleges that this breach caused substantial financial and personal harm, including the loss of the remaining $30 million owed under the agreement, together with statutory interest.

5. Sequoia's Knowledge and Benefit

Plaintiff alleges that Sequoia Capital knew or should have known of Goguen's conduct and the settlement agreement resolving claims arising from his actions.

Sequoia benefited from the agreement because:

- it allowed Goguen to remain associated with the firm without public litigation;
- it suppressed allegations that could have affected the firm's reputation, investments, and fundraising;
- it shielded Sequoia from scrutiny regarding the conduct of one of its senior partners.

Under federal and state law, entities that knowingly benefit from wrongful conduct carried out by their partners or agents may be held liable for damages arising from that conduct.

6. Agency and Partnership Liability

At all relevant times, Goguen acted as a partner and agent of Sequoia Capital.

Under partnership and agency principles, a partnership may be liable for acts committed by a partner within the scope of the partnership relationship or through the use of partnership resources.

Plaintiff alleges that Goguen's actions—including the execution and subsequent breach of the settlement agreement—were undertaken while he was a partner of Sequoia and were facilitated by the firm's institutional infrastructure.

7. Resulting Liability

As a direct and proximate result of the actions described above, Defendant Sequoia Capital is liable for damages arising from:

- the breach of the settlement agreement;
- the financial losses sustained by Plaintiff;
- the continued refusal to satisfy obligations arising from the agreement.

Plaintiff seeks recovery of the unpaid settlement balance, together with interest and all other relief permitted by law.

## THE SETTLEMENT AGREEMENT IS VALID AND ENFORCEABLE

# 1. Existence of the Settlement Agreement

On or about May 23, 2014, Plaintiff Amber Doe and Michael Lewis Goguen entered into a written settlement agreement resolving claims arising from Goguen's misconduct toward Plaintiff.

The agreement required Goguen to pay $40,000,000 to Plaintiff in exchange for the resolution of certain claims and the maintenance of confidentiality.

The agreement constitutes a valid and binding contract supported by consideration.

## 2. Plaintiff's Performance

Plaintiff performed all obligations required of her under the settlement agreement, including refraining from initiating litigation against Goguen and maintaining confidentiality as required by the agreement.

Plaintiff therefore satisfied the conditions necessary for payment under the contract.

## 3. Defendants' Breach

Despite the existence of a valid and enforceable contract, Goguen and entities acting in concert with him failed and refused to pay the agreed settlement amount.

Instead of honoring the agreement, Defendants engaged in a series of actions designed to evade their contractual obligations, including:

- refusing to pay the settlement funds;
- initiating retaliatory legal actions;
- using affiliated law firms and agents to obstruct Plaintiff's efforts to enforce the agreement.

These actions constitute material breach of the settlement agreement.

## 4. Amount Owed

Defendants owe Plaintiff:

$40,000,000 in principal settlement funds

plus

prejudgment interest at 10% compounded annually beginning May 23, 2014.

Defendants' continued refusal to satisfy the settlement obligation constitutes an ongoing breach.

## 5. Damages

As a direct result of Defendants' breach, Plaintiff has suffered substantial financial harm and is entitled to recover the full settlement amount, accrued interest, and additional damages permitted by law.

# STATEMENT OF FACTS

# V.

A. Introduction: Plaintiff's Ordeal and Jurisdictional Foundation

The acts alleged herein violate peremptory norms of international law (jus cogens), including the prohibitions against slavery, torture, enforced disappearance, and trafficking in persons. These are actionable under the Alien Tort Statute, binding international treaties including the Palermo Protocol, CEDAW, ICCPR, and CAT, and under the universal jurisdiction doctrine recognized in both U.S. and international jurisprudence.

11. Plaintiff Amber Doe("Amber ") is a Canadian citizen born of American born ancestors and survivor of transnational human trafficking, systemic sexual exploitation, torture, forced labor, and severe violations of her civil, constitutional, and internationally recognized human rights.

12. From the age of fifteen, Plaintiff was trafficked across international and U.S. state borders by organized criminal networks, including the Hells Angels, and ultimately fell under the control of Defendant MICHAEL LEWIS GOGUEN, a U.S.-based billionaire financier residing in Montana and conducting interstate and international commercial activities.

13. The events pleaded herein give rise to claims under federal law, including but not limited to: the Trafficking Victims Protection Act (18 U.S.C. §§ 1581 et seq.), the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-68), 42 U.S.C. § 1983, and

related civil rights and constitutional violations, along with pendent claims under state and international law.

B. Pattern of Human Trafficking and Sexual Exploitation

14. Amber was first trafficked by a family member into the hands of the Hells Angels at age fifteen and funnelled into a high-end international sex trafficking circuit marketed as elite modelling.

15. For years, Amber was trafficked through strip clubs, luxury properties, sporting events, and private parties in jurisdictions including the New York, U.S. Virgin Islands, China, Japan, Guam, Puerto Rico, Florida, Michigan, Arizona, Georgia, Texas, New Jersey, Oklahoma, Alberta, Ontario, Quebec, and various European nations.

16. After being Trafficking to Billionaire pedophiles in The US Virgin Islands She was trafficked to Texas. After arriving in Dallas, Texas, Amber was introduced to Defendant Goguen through a VIP club manager affiliated with organized crime. Goguen assumed total coercive control over her, promising safety in exchange for submission.

17. Goguen transported Amber using aircraft and shell corporations, subjected her to forced sexual servitude, psychological domination, and coerced compliance via drugging and sexual violence. He used financial instruments and entities including Sequoia Capital expense accounts to fund this enterprise.

18. Amber was repeatedly drugged and raped, including during a high-profile assault in Toronto, Ontario after discharge from an ICU with a head injury. Goguen used Sequoia Capital's resources to fly her there.

19. Amber was forced by Goguen to create sham entities (e.g., Je Ne Sais Que Enterprises, LLC) to disguise her trafficking and conceal the financial transactions from Goguen's spouses and the IRS. These funds were laundered through offshore number company accounts and U.S. banks.

20. The trafficking escalated to increasingly violent sexual acts. Amber was drugged with substances such as Rohypnol, subjected to forced sodomy, degradation, and sexual torture.

C. Physical Harm and Medical Abuse

21. In 2010, Amber was diagnosed with multiple high-risk HPV strains. Goguen knowingly withheld his STI status and coerced her to continue sexual acts while infected.

22. In 2012, he caused a 7-inch anal tear requiring emergency surgery in London, UK. He paid $100,000 to suppress the incident but evaded all legal accountability.

23. Goguen intensified his psychological abuse when Amber resisted further exploitation, hiring private operatives to surveil her and allegedly attempting to solicit her murder.

D. Coerced Settlement and Legal Entrapment

24. In 2014, under coercion and duress, Amber was forced to terminate her counsel and accept representation from Sequoia capitals elite legal team including Quinn Emanuel LLP, Goodwin Procter LLP, and Wilson Sonsini LLP.

25. On May 23, 2014, Amber was coerced into signing a $40 million settlement agreement drafted by the aforementioned law firms at the Rosewood Sand Hill Hotel in California, a known site of Sequoia Capital Sex Enterprises and Goguen's trafficking operations. The agreement was executed without independent counsel or negotiation. Witnessed and Signed Before Sequoia Capitals Staff Notary.

26. Goguen then immediately braced the contact force her to endure his sexual abuse to seal the deal

27. Only one installment of $10 million was paid. Goguen defaulted, resumed retaliation, and deployed Matthew Marshall, his former security chief (now a convicted felon), to surveil and attempt to assassinate Amber .

28. Only days after the agreement was sign pedophilic serial rapist Goguen materially breached the confidentiality clause of the contract causing her further damage by disseminating her name and images.

E. Obstruction of Justice and Judicial Corruption (2016–2025)

29. Between 2016 and 2026, Amber faced systematic obstruction in U.S. courts. She was sabotaged by attorneys bribed or coerced by Sequoia Capital, Goguen and Quinn Emanuel LLP.

30. Her San Mateo County bench trial was held in absentia while she was incapacitated after major surgery. A $14 million fraudulent judgment, fraudulent restraining order, and illegal unconstitutional gag order were drafted by Quinn Emanuel and were issued by bribed corrupt Judge Danny Chou, based on falsified evidence and perjured testimony.

31. Her appeals were circumvented. Ontario courts illegally enforced the fraudulent California judgment by issuing a Mareva injunction that illegally froze her assets and her siblings personal assets despite jurisdictional defects and lack of service.

32. Judges Barbara Conway and Cory Gilmore signed asset freezes despite acknowledging in ex parte emails with the Quinn Emanuel lawyers that Amber was not served and that they were basing this mareva injection on the falsified addresses and fake back account

numbers in Ontario, forcing her into homelessness and leaving her with no access to critical medical treatment and a additional surgery during the COVID-19 pandemic.

F. Federal and Interstate Sabotage

33. From 2023 to 2025, Amber filed multiple federal civil rights and trafficking lawsuits in California, New York, D.C., and Montana. All were wrongfully dismissed by biased or conflicted judges, including Maame Frimpong, Steve Kim, Laura Taylor Swain, David. O. Carter and Donald Molloy.

34. Quinn Emanuel unlawfully interfered in the Southern District of New York by submitting ex parte communications via Fedex to Chief Judge Swain all of which are in evidence, resulting in the improper transfer of Amber 's case.

35. Amber 's filings were repeatedly dismissed under inapplicable doctrines such as res judicata despite no prior adjudication on the merits.

G. Legal Fraud, Retaliation, and Vexatious Litigant Designation

36. Amber 's cross-complaints in California were sabotaged. Judges like Nico Dourbetas and Stephanie Bowick dismissed her filings, denied fee waivers, and improperly declared her a vexatious litigant at thew direction go Attorney general Rob Bonta.

37. Amber was denied representation, forced into pro se status, and then criminalized in a fraudulent contempt trial for "defaming" her trafficker. Judges Danny Chou, Elizabeth Lee, Susan Greenberg, and Nina Shapirshteyn invented the sham proceedings and presided over quasi-criminal proceedings that denied her due process and were held in absence of jurisdiction.

38. Diane Doolittle, of Quinn Emanuel, issued illegal subpoenas in closed cases without jurisdiction or service, violating Amber 's rights.

H. Final Acts of Retaliation and Judicial Complicity

39. As recently as 2025, Amber 's filings to vacate fraudulent judgments were summarily denied without hearing by the Chief Judge of the California Supreme Court . She was subjected to ex parte hearings, surveillance, asset freezes, and denial of medical care.

40. California state bar, law enforcement and the judicial council judges refused to investigate her reports of lawyer embezzlement and judicial fraud, citing her "vexatious" designation. Her complaints to oversight bodies disappeared from dockets and databases.

41. The Governor of California Gavin Newsom and Attorney General Rob Bonta were made aware of over 40 instances of judicial corruption yet refused to intervene.

32. After being subjected to repeated sexual exploitation and trauma, Amber sought to enforce her rights and secure safety from further abuse. In retaliation, Goguen and his legal team, including Quinn Emanuel, Goodwin Procter, and Wilson Sonsini, escalated coercive tactics including surveillance, gaslighting, and deprivation of resources. Plaintiff was deliberately isolated from legitimate legal counsel and forced to engage in proceedings managed by her abusers' attorneys, violating her rights under 18 U.S.C. § 1592 (abuse of legal process to maintain trafficking) and 18 U.S.C. § 1595. The above facts demonstrate a criminal enterprise involving transnational trafficking, judicial corruption, obstruction of justice, financial exploitation, and state complicity.

33. Quinn Emanuel, acting in coordination with Sequoia Capital and Goguen, facilitated the execution of a fraudulent "personal injury settlement agreement" in May 2014 at the Rosewood Sand Hill Hotel, a known site of trafficking and coercion used by Goguen. The agreement was signed under extreme duress, without independent counsel, and witnessed by Sequoia's in-house notary. It purported to settle Plaintiff's claims for $40 million payable in four $10 million installments, but only the first payment was made. This act constitutes contractual fraud, obstruction of justice, and enforcement of a trafficking-based contract in violation of 18 U.S.C. § 1594 and common law doctrines voiding contracts procured under duress. These facts support Plaintiff's claims under the U.S. Constitution, the TVPA, RICO, 42 U.S.C. §1983, and supplemental claims under international and foreign law. Amber Doe seeks full declaratory, injunctive, equitable, and monetary relief from this Court.

E. Systematic Attorney Sabotage and Fraudulent Proceedings

34. In the lead-up to the 2019 trial, attorneys from Quinn Emanuel arranged a trip to Las Vegas with Amber 's retained counsel, William Paoli. During this meeting, Paoli was allegedly bribed to sabotage Plaintiff's case and failed to appear at trial, abandoning his client without cause.

35. Amber 's judicial proceedings were further obstructed by a $900-per-hour referee appointed from JAMS, former Judge Read Ambler, who continued proceedings despite Amber being physically incapacitated, sedated, and medically prohibited from attending.

36. While Plaintiff was pro se and under post-operative care, bone marrow transplant, including tungsten detoxification, orthopaedic recovery with rods and plates, seizure management, and bone marrow transplant, San Mateo Judge John Grandsaert denied a meritorious motion to

continue the trial. This was a clear denial of due process in violation of the Fifth and Fourteenth Amendments and ensured Plaintiff was unrepresented and medically unfit when the fraudulent trial proceeded.

37. On the basis of fabricated testimony and falsified evidence provided by Quinn Emanuel, Judge Danny Chou entered a $14 million default judgment, an illegal gag order, and a fraudulent restraining order, all drafted by Quinn Emanuel Lawyers and issued without trial on the merits, notice, or opportunity to respond.

38. Despite appeals being pending in California appellate courts, the judgment was unlawfully enforced in Canada. The Ontario Superior Court, knowingly ignoring California law which stays judgment enforcement during appeal, executed the judgment with the assistance of Defendant lawyers and judges operating in bad faith and without lawful jurisdiction.

39. Ontario Superior Court Judges Cory Gilmore and Barbara Conway issued a Mareva injunction to freeze Amber 's assets based on fabricated evidence and undisclosed ex parte email communications with the Quinn Emanuel Lawyers.

40. Defendants Monique Jilesen and Sahar Talebi, acting through Lenczner Slaght LLP, falsified banking records, addresses, and corporate documents to fraudulently assert jurisdiction in Ontario. They reclassified Plaintiff as a "corporation" to bypass individual rights and execute asset seizure unlawfully.

41. In written correspondence, Judges Gilmore and Conway admitted Amber had not been served, but nonetheless signed freezing orders which denied Plaintiff access to medical funds, housing, and urgent surgery, forcing her into homelessness during the global COVID-19 pandemic.

42. The asset freeze extended beyond Amber , unlawfully impacting the bank accounts of her siblings and family members without notice, standing, or due process. This action violated constitutional protections, property rights, and international human rights standards.

43. During this time, Quinn Emanuel attorneys actively intercepted and obstructed Amber 's communications with U.S. and Canadian law enforcement, subverting potential criminal investigations into human trafficking, sexual assault, and fraud.

44. Despite full knowledge of the falsified proceedings, Lenczner Slaght LLP and Quinn Emanuel appeared before the Supreme Court of Canada in bad faith, using fabricated evidence and procedural fraud. Amber is currently pursuing claims for fraud, obstruction, and conspiracy against the Canadian Crown and named individuals.

F. Systematic Attorney Sabotage and Fraudulent Proceedings (continued)

45. Plaintiff's legal representation was persistently sabotaged. Her attorneys, Gregory Brown and Herb Fox, embezzled more than $300,000 from her trust account and failed to represent her in her legal malpractice case and failed to file and execute timely appeals, causing irreparable harm. These actions constitute violations of fiduciary duty, constructive fraud, and obstruction of access to the courts in violation of 42 U.S.C. § 1983.

46. In Orange County JAMS ARBITRATION, Defendant lawyer/judgePatricia Glaser (Glaser Weil LLP), in conspiracy with JAMS arbitrators and mediators, blocked a $40 million legal malpractice case brought by Amber , depriving her of the opportunity to be heard and redress meritorious claims.

47. Amber 's retained counsel From Paoli and Purdy at who was tampered with and bribed by glaser and her lawyers from Nemecek and Cole, Paoli & Purdy LLP failed to file responses or appear for arbitration, despite full payment by Plaintiff of all attorney fees, arbitration fees, and expert witness costs. Their failure resulted in another default judgment, procured through extrinsic fraud, breach of contract, and deliberate legal malpractice.

48. In 2022, Amber filed a motion in San Mateo Superior Court to vacate the fraudulent judgment under California Code of Civil Procedure § 473(d) for extrinsic fraud. Judge Danny Chou delayed the matter for 90 days, then denied the motion citing false procedural grounds, despite the absence of any statute of limitations for extrinsic fraud.

49. During oral proceedings for the motion to vacate, Quinn Emanuel partner Diane Doolittle brazenly publicly stated, "We don't bribe judges," without provocation. No other party had raised this issue, and her statement was construed as an unsolicited admission relevant to ongoing allegations of judicial bribery and collusion.

50. In a retaliatory action brought by former attorney Rivers Morrell in 2016, shortly after Amber terminated his services under duress, Amber 's cross-complaint was deliberately sabotaged through judicial collusion, attorney conflict, and ex parte judicial interference from Quinn Emanuel.

51. In 2024, Amber 's cross-complaint was systematically undermined by Gouge's counsel and several sets of her prior counsel. Judge Nico Dourbetas, acting on motions orchestrated by Quinn Emanuel and Goguen's defense team, declared Amber a vexatious litigant without proper hearing or findings, depriving her of court access in violation of due process and the First Amendment.

52. In 2024, despite Amber having already been granted a fee waiver and documented as indigent, Judge Dourbetas imposed a $50,000 security bond to maintain her cross-complaint. This unconstitutional demand effectively barred Amber , a trafficking survivor residing in a shelter, from proceeding with claims against billionaires and elite legal institutions.

G. Federal Court Obstruction and International Denial of Justice

55. In March 2023, Plaintiff filed a comprehensive civil complaint in the U.S. District Court In California, naming all primary actors, including state judges, attorneys, billionaires pedophiles, rapists and traffickers, and affiliated corporations for violations under the Trafficking Victims Protection Reauthorization Act (TVPRA), 42 U.S.C. § 1983, and related constitutional and statutory claims. District Judge Maame Frimpong dismissed the complaint without a hearing, erroneously citing res judicata to bar claims against numerous defendants who had never been parties to any prior action.

56. Between 2023 and 2025, Amber filed multiple federal complaints alleging human trafficking, sexual slavery, civil rights violations, obstruction of justice and systemic fraud. Federal judges, including Maame Frimpong, Donald Molloy, Steve Kim, David O. Carter, and Laura Taylor Swain, dismissed these actions under manufactured pretexts, often invoking res judicata or jurisdictional defects not supported by the record.

57. Quinn Emanuel partner Diane Doolittle interfered directly with Amber ’s active federal litigation by sending ex parte communications to U.S. District Judge Laura Taylor Swain, including a physical FedEx letter sent to chambers in violation of judicial canons and ethical rules, resulting in procedural interference with a case pending in the Southern District of New York.

58. In July 2023, after Amber ’s complaint and fee waiver were accepted in the Southern District of New York, Chief Judge Swain inexplicably transferred the case back to the Central District of California for adjudication, citing Frimpong’s prior rulings, despite the fact that federal summons had been approved and service was in progress via the U.S. Marshals Service.

59. Magistrate Judge Steve Kim and District Judge Maame Frimpong then demanded that the case be reassigned to their court in California. When the Clerk’s Office refused, citing it as a discovery matter not a 42 U.S.C. § 1983 civil rights claim, Kim and Frimpong bypassed standard assignment procedures and dismissed the complaint without any hearing, briefing, or adjudication on the merits.

60. In August 2023, Plaintiff filed a separate civil complaint in the U.S. District Court for the District of Columbia (Amber Doe v. Vox Media et al.) to pursue relief based on ongoing defamation, interference with federal rights, and trafficking-related injuries. Once again, Quinn Emanuel intervened and manipulated judicial discretion to have the matter dismissed without hearing.

61. Plaintiff then filed in the U.S. District Court for the District of Montana, where Defendant Michael Goguen resides. The case was intercepted and reassigned to Senior Judge Donald Molloy, who had previously presided over criminal proceedings involving Goguen's former security contractor, Matthew Marshall. Judge Molloy denied Amber 's right to proceed, citing frivolous grounds and refusing to consider the merits of her trafficking and constitutional claims.

H. 2016–2024 Orange County Cross-Complaint and Judicial Persecution

62. In 2016, attorney Rivers Morrell, whom Plaintiff had been forced to terminate under duress, filed a $100 million action in Orange County Superior Court (Rivers Morrell v. Baptiste), naming Amber , Goguen, Quinn Emanuel, and Goodwin Procter as defendants. The case was improperly stayed pending the outcome of the fraudulent San Mateo judgment procured without notice or jurisdiction.

63. Defendant Patricia Glaser of Glaser Weil LLP intervened in the Orange County matter and orchestrated the removal of Amber 's retained counsel from Paoli & Purdy LLP through corrupt influence and bribery, thereby sabotaging Amber 's $40 million legal malpractice claim against Glaser Weil. The case was diverted to a confidential arbitration proceeding at JAMS, funded in full by Plaintiff, but hidden from her by her own attorneys.

64. Amber had paid legal fees, arbitration fees, and expert witness costs in full. However, Paoli & Purdy LLP, under Glaser's interference, failed to notify Plaintiff of the scheduled arbitration. As a result, the firm did not appear, and Glaser Weil secured a fraudulent multi-million dollar default judgment despite never serving discovery or proving any claims.

65. Between 2016 and 2024, Amber retained four separate legal teams to defend and prosecute her interests in the Orange County litigation. None filed a proper Answer on her behalf. By 2024, Glaser Weil's counsel, Nemecek & Cole LLP, was representing multiple adverse parties simultaneously, including all of Amber 's former attorneys, Glaser Weil, Rivers Morrell, The Law. Firm of Rivers J Morrell the III and Paoli & Purdy, in a textbook violation of ethical conflict rules and an egregious breach of fiduciary duty.

66. In July 2023, Amber filed a cross-complaint in the Orange County action, which was properly served on all parties. The filing included claims for legal malpractice, fraud, civil conspiracy, and violations of her federal civil rights under 42 U.S.C. § 1983 and the TVPRA.

67. On September 11, 2023, during a Zoom hearing, Judge Nico Dourbetas granted Amber 's fee waiver on grounds of indigency. However, at the same hearing, Quinn Emanuel attorney Kyle

Batter announced a “secret settlement” between Rivers Morrell and Goguen, made without Plaintiff’s participation or knowledge, further evidence of collusion and bad faith.

68. Despite having granted Amber ’s fee waiver, Judge Dourbetas subsequently issued orders denying all of her motions without legal reasoning. He allowed Quinn Emanuel to proceed with litigation, while simultaneously claiming the case was “stayed against Amber ”, a contradictory and unconstitutional posture that deprived Amber of access to the courts.

69. In July 2024, Judge Dourbetas issued an order demanding Amber post a $50,000 bond within 30 days or face dismissal of her cross-complaint. This demand, made of a trafficking survivor living in a shelter, constituted an unlawful denial of access to justice in violation of her rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

70. Amber filed three separate motions for recusal of Judge Dourbetas on grounds of bias, conflict of interest, and judicial misconduct. All were summarily denied without explanation. Multiple attorneys from Quinn Emanuel and other firms submitted joinders supporting the vexatious litigant designation against Amber to silence her and deprive her of any redress against her abusers.

71. In August 2024, Judge Dourbetas dismissed Amber ’s case and unlawfully declared her a vexatious litigant, thereby barring her from initiating or continuing any legal proceedings in California without first obtaining permission from the court. This designation, made without due process or findings of frivolous conduct, violated Amber ’s rights under the U.S. Constitution, international law protecting trafficking survivors, and California’s own procedural standards.

I. Retaliatory and Illegal Subpoenas

72. Plaintiff appealed Judge Dourbetas’s dismissal to the California Court of Appeal for the Fourth Appellate District. All of her appeals were summarily dismissed without legal justification, allegedly under undue influence from Quinn Emanuel. In some cases, the appeals disappeared entirely from the docket, indicating tampering with the court record and denial of procedural due process.

73. The State Bar of California, despite receiving multiple bar complaints from Plaintiff supported by detailed evidence, refused to investigate or discipline any attorneys involved in embezzlement, conflict of interest, fraud, falsification of evidence, bribery, stalking, hacking, judge tampering or subornation of perjury. The Bar cited Amber ’s status as a “vexatious litigant” as a basis to deny her even the right to report crimes, an unconstitutional deprivation of equal protection and access to remedy.

74. Plaintiff filed judicial complaints against four state court judges in California with the Judicial Council. The complaint documents and the judges’ names disappeared from the system

without adjudication. When Amber appeared in person at the Judicial Council's offices in San Francisco, she was handed blank dismissal forms with no judge names or investigative records attached.

75. During the same period, Canadian Judges Cory Gilmore and Barbara Conway, cooperating with Quinn Emanuel and Lenczner Slaght LLP, issued ex parte freezing orders and relied on falsified evidence, falsified address, falsified bank accounts creating fake jurisdiction to deny Plaintiff access to her assets and prevent her from funding legal representation or urgent medical care.

76. Staff at Plaintiff's Canadian banking institutions, acting at the direction of Defendant Monique Jilesen, blocked Amber 's transactions and provided unauthorized financial data to Defendants, resulting in unlawful asset seizure and obstruction of Plaintiff's access to life-sustaining treatment and constitutional rights. All of the bank staff who participated in the conspiracy have been terminated.

77. In 2025, Diane Doolittle, acting in bad faith and with no legal jurisdiction, issued subpoenas in a closed California case that had been inactive since 2019. These subpoenas were directed at Google, Verizon, Mint Mobile, T-Mobile, AT&T, Cox Communications Facebook, and other third-party platforms, and document repositories, seeking Amber 's private information without notice, service, or court approval, violating the Stored Communications Act (18 U.S.C. § 2701 et seq.) and Plaintiff's rights under the First and Fourth Amendments.

78. Plaintiff only became aware of these illegal subpoenas after being contacted by Google's Legal Compliance Department in May 2025, who questioned whether she wished to move to quash the subpoenas. These unlawful discovery efforts in a closed case constitute abuse of process and retaliation against a protected individual under 18 U.S.C. § 1592 (obstruction of enforcement) and 18 U.S.C. § 1512(b) (witness tampering and retaliation).

J. Final Acts of Judicial Retaliation and Criminal Fraud

79. In July 2024, Plaintiff filed a motion to vacate a second fraudulent multi-million-dollar judgment entered in 2019 in Los Angeles County Superior Court. The judgment had been procured without Plaintiff's knowledge by Patricia Glaser and her firm, Glaser Weil LLP. Plaintiff only discovered the proceeding in Spring 2024 during an in-person records review at the Los Angeles courthouse.

80. From July to November 2024, Los Angeles Superior court Judge Stephanie Bowick refused to grant Plaintiff's fee waiver on three separate occasions, thereby unlawfully barring her from proceeding with the motion to vacate Glaser Weil LLPs fraudulent multi million dollar judgement. Judge Bowick later held an undisclosed chambers proceeding and summarily denied

the motion to vacate, in violation of California due process rights and federal constitutional guarantees.

81. Plaintiff subsequently removed the matter to federal court under 28 U.S.C. § 1441(c) and § 1443 (civil rights removal). In furtherance of the conspiracy to obstruct justice The motion to vacate was improperly dismissed with no legal basis after being brought up on appeal before the U.S. Court of Appeals for the Ninth Circuit.

82. In August 2024, Plaintiff appeared in person in San Mateo County Superior Court for a quasi criminal contempt trial based on allegations of "criminal defamation" of Michael Goguen. Plaintiff had been ordered to appear under threat of arrest for speech protected under the First Amendment. She was instructed by Judge Susan Greenberg to consult the San Mateo County Courts Private Defender's Office, but they failed to return her calls. At a follow-up hearing in October 2024, an attorney named Katrina Steiner appeared in court, unannounced and without prior contact, and falsely claimed to represent Amber .

83. Between October 2024 and March 2025, Steiner conducted no discovery or trial preparation. Amber later discovered that court appointed counsel Katrina Steiner was a close personal friend of Judge Susan Greenberg, who was originally presiding over the contempt trial.

In January 2025 Susan Greenberg was moved to probate. Judge Nina Shapirshteyn was appointed Amber 's repeated requests to proceed pro se or obtain independent counsel were denied in a Marsden hearing, depriving her of her Sixth Amendment right to effective assistance of counsel.

84. Amber subsequently discovered that California Attorney General Rob Bonta and San Mateo Judge Danny Chou had a long-standing personal and professional relationship, dating back to their shared time clerking for the California Supreme Court, evidence of institutional conflict that was never disclosed to the parties.

85. Between January and March 2025, Judge Nina Shapirshteyn, newly assigned to the matter, denied five of Amber 's meritorious motions:
(1) to vacate the fraudulent judgment;
(2) for new trial;
(3) to disqualify Quinn Emanuel due to financial interest in the prosecution;
(4) for preliminary injunction and temporary restraining order (TRO); and
(5) to vacate the unconstitutional gag order.
The case proceeded to a rigged bench trial in March 2025, despite having been properly removed to federal court in January 2025. Plaintiff's request to proceed pro se was again illegally denied.

86. In March 2025, Judge Shapirshteyn presided over a quasi-criminal bench trial without jurisdiction and in abstentia found Plaintiff guilty of "criminal defamation" of Pedophilic serial rapist and trafficker who exploited at least 5000 girls and women globally since the 1990s,

Michael Goguen, a legal impossibility under U.S. constitutional law, as defamation is a civil matter and speech about public figures is protected by the First Amendment.

87. Plaintiff later learned via internet records that she had been assigned no-bail status and was subject to an arrest warrant for a misdemeanour contempt charge stemming from her public exposure of billionaire pedophiles. Despite having no criminal record and posing no threat to the community, Plaintiff was treated more severely than violent felons, murderers and serial rapists further evidence of institutional retaliation and viewpoint discrimination.

K. Supreme Court of California Sabotage and Final Federal Violations

88. In 2024, Plaintiff filed multiple emergency writs with the Supreme Court of California, including a Writ of Certiorari, Writ of Mandamus, Writ of Error Coram Nobis, and applications for Preliminary Injunctions. All were denied by Chief Justice Patricia Guerrero, who cited Amber 's unlawful "vexatious litigant" designation as a barrier to relief, despite that designation itself having been imposed in violation of constitutional rights and without due process.

89. Judges Stephanie Bowick, Danny Chou, and Nina Shapirshteyn each denied motions critical to Plaintiff's survival and legal redress, including motions to vacate fraudulent judgments and to disqualify attorneys with direct financial and ethical conflicts. These denials cumulatively deprived Plaintiff of access to meaningful judicial remedy and constitute violations of 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments.

90. Judge Bowick refused to grant Plaintiff's fee waiver and held an unauthorized, closed-door hearing to deny Plaintiff's motion to vacate a judgment procured by fraud and perjury, thereby violating both federal and state due process rights.

91. Judge Shapirshteyn conducted a quasi-criminal contempt trial in March 2025 without jurisdiction, following Plaintiff's federal removal in January. She found Amber "guilty" of criminal contempt in absentia, based on constitutionally protected speech. The trial was rigged, retaliatory, and facially invalid under U.S. law.

92. Between April and May 2025, Diane Doolittle of Quinn Emanuel served illegal subpoenas in the closed 2019 San Mateo matter. Despite discovery having been closed for over six years, she issued subpoenas, using the old case number, via A&A Legal to Google, Yahoo, Mint Mobile Verizon, Cox communications T-Mobile, AT&T, and Verizon, without court authorization or service on Amber .

93. In late May 2025, Plaintiff was contacted by Google's Legal Compliance Department regarding these subpoenas, which sought private and protected data. Plaintiff had never received notice of their issuance. These acts constitute clear violations of the Stored Communications Act,

abuse of process, and attempted intimidation in retaliation for Amber 's protected litigation and public exposure of criminal misconduct.

94. The above-stated facts represent approximately fifteen percent of the known felonious conduct perpetrated by Defendants and their agents. Plaintiff reserves the right to supplement these facts as discovery proceeds. All named Defendants are subject to joint and several liability, including vicarious liability for the actions of their agents, employees, and co-conspirators under TVPRA, RICO, § 1983, and common law conspiracy doctrines.

## COUNTS LIST

## VI.

I. TRAFFICKING & SEXUAL VIOLENCE

Count 1 – Human Trafficking (TVPRA)
18 U.S.C. §§1581–1595

Count 2 – Sexual Assault / Battery / Rape

Count 3 – Torture / Severe Abuse

II. RICO & ENTERPRISE CRIMES

Count 4 – Civil RICO
18 U.S.C. §1962(c)

Count 5 – RICO Conspiracy
18 U.S.C. §1962(d)

III. FRAUD & LITIGATION ABUSE

Count 6 – Fraud and Fraudulent Inducement

Count 7 – Fraud on the Court

Count 8 – Civil Conspiracy

Count 9 – Abuse of Process

IV. CONTRACT & FINANCIAL CLAIMS

Count 10 – Breach of Written Settlement Agreement

Count 11 – Breach of Covenant of Good Faith

Count 12 – Unjust Enrichment

V. PERSONAL INJURY

Count 13 – Intentional Infliction of Emotional Distress

Count 14 – Gross Negligence / Willful Misconduct

COUNT 15- CONSPIRACY TO CAUSE PLAINTIFF'S DEATH VIA DEPRIVATION OF MEDICAL TREATMENT, FINANCIAL RESOURCES, AND ACCESS TO CARE AGAINST DEFENDANT
SEQUOIA CAPITAL OPERATIONS, LLC

COUNT 16- REFOULEMENT / JUDICIAL REFOULEMENT OF A TRAFFICKING SURVIVOR

# CAUSES OF ACTION

# VII.

**COUNT ONE**

**Human Trafficking (TVPRA)**
**18 U.S.C. §§ 1589–1595**
**Against Defendant Sequoia Capital Operations, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Trafficking Venture
At all relevant times, Michael Lewis Goguen was a senior partner of Defendant Sequoia Capital Operations, LLC, one of the most powerful venture capital firms in the United States.
Using the authority, wealth, and institutional infrastructure associated with his position at Sequoia Capital, Goguen subjected Plaintiff to a long-running pattern of coercion, sexual exploitation, and trafficking activity.
The trafficking venture operated across multiple jurisdictions, including Colorado, California, Montana, and other states, utilizing interstate transportation, luxury hospitality venues, financial channels, and corporate resources.
The venture involved the recruitment, coercion, transportation, and control of Plaintiff for the purpose of sexual exploitation and domination through force, fraud, and psychological coercion.
Plaintiff was transported across state lines and subjected to repeated acts of sexual violence, coercion, and intimidation while Goguen maintained his position as a senior partner at Sequoia Capital.
The venture relied on financial resources, legal infrastructure, and institutional protection associated with Goguen's position at Sequoia.
These resources enabled Goguen to:
• transport Plaintiff across jurisdictions;
• maintain access to luxury properties, travel infrastructure, and financial channels used to facilitate the exploitation;
• deploy legal teams and investigators to silence and control Plaintiff;

• negotiate and execute a $40 million settlement agreement designed to conceal the trafficking and prevent public exposure.

The settlement agreement executed on May 23, 2014, requiring payments totaling $40 million, was intended to suppress disclosure of the trafficking and sexual exploitation that had occurred.

Sequoia Capital knowingly benefited from the trafficking venture because the settlement and associated confidentiality provisions prevented public disclosure of the conduct of one of its senior partners and shielded the firm from reputational and financial harm.

Despite the execution of the settlement agreement, the trafficking enterprise continued through legal retaliation, intimidation, and obstruction designed to prevent Plaintiff from obtaining justice.

Under 18 U.S.C. § 1595, any entity that knowingly benefits from participation in a trafficking venture is civilly liable to the victim.

Defendant Sequoia Capital knowingly benefited from Goguen's trafficking venture by protecting its partner, preserving its financial interests, and enabling the continued concealment of the exploitation.

As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe physical, psychological, financial, and reputational harm.

Plaintiff therefore seeks damages under the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act.

I'm going to give you a clean, court-ready version of Count One that keeps the strength of what you wrote but removes the things that judges commonly dismiss (over-pleading, treaty overload, unclear elements).

This version keeps the TVPRA claim extremely strong, ties in the enterprise, and clearly alleges financial benefit and participation in a trafficking venture, which are the two things courts focus on most under 18 U.S.C. §1595.

3. Force, Fraud, and Coercion

Plaintiff was subjected to a pattern of coercion, intimidation, psychological domination, and abuse of power, including:

• transportation across state lines for sexual exploitation;
• repeated acts of sexual violence and coercion;
• use of financial control, intimidation, and legal pressure to maintain compliance;
• exploitation of Plaintiff's vulnerability to prevent resistance and disclosure.

These acts constitute force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.

4. Participation by Sequoia Capital

Defendant Sequoia Capital Operations, LLC knowingly participated in the trafficking venture by providing, enabling, or failing to prevent the use of:

• financial resources;
• institutional authority and infrastructure;

• access to travel, properties, and logistical support;
• legal and investigative resources used to suppress disclosure and control Plaintiff.
Plaintiff further alleges that Sequoia, through its partner Goguen and coordinated legal and financial actions described in this Complaint, participated in and facilitated the continuation and concealment of the trafficking venture.

5. Knowing Financial Benefit
Sequoia Capital knowingly benefited, financially and otherwise, from participation in the trafficking venture within the meaning of 18 U.S.C. § 1595.
This benefit included:
• protection of the reputation and financial interests of the firm;
• avoidance of liability and public exposure;
• enforcement and negotiation of a confidential settlement agreement dated May 23, 2014, requiring payments totaling $40 million;
• continued concealment of the underlying trafficking conduct.
The settlement agreement dated May 23, 2014, prepared by legal counsel retained by Defendant Sequoia Capital Operations, LLC, including Quinn Emanuel Urquhart & Sullivan LLP, Wilson Sonsini Goodrich & Rosati LLP, and Goodwin Procter LLP, and notarized by a notary acting on behalf of Sequoia Capital, was intended, at least in part, to resolve and contain claims arising from the underlying conduct and to prevent public disclosure of the trafficking and sexual exploitation described herein.
Plaintiff alleges that Defendant Sequoia Capital Operations, LLC had actual or, at minimum, constructive knowledge of the trafficking venture based on, among other things:
• repeated complaints, disputes, and legal matters arising from Michael Lewis Goguen's conduct;
• the negotiation, execution, and enforcement of the May 23, 2014 settlement agreement addressing claims arising from that conduct;
• the retention and coordination of legal counsel across jurisdictions to manage, contain, and respond to claims related to the underlying exploitation;
• the continued provision of financial, legal, and institutional support to Goguen despite knowledge of allegations and disputes arising from his conduct.
These facts, taken together, support a plausible and reasonable inference that Sequoia Capital knew or should have known that the venture in which it participated involved trafficking, coercion, and sexual exploitation.

6. Continuation Through Retaliation and Suppression
Plaintiff alleges that the venture did not end with the execution of the settlement agreement, but continued through:
• coordinated legal retaliation;
• financial and litigation pressure;
• obstruction of Plaintiff's ability to obtain remedies;
• actions designed to prevent exposure and maintain control.
These acts further demonstrate knowing participation in and benefit from the trafficking venture.

7. Injury to Plaintiff
As a direct and proximate result of Defendant's participation in and benefit from the trafficking venture, Plaintiff suffered:
• severe physical and psychological harm;
• loss of income, assets, and financial stability;
• deprivation of safety, housing, and medical care;
• ongoing emotional distress and reputational harm.

8. Civil Liability
Pursuant to 18 U.S.C. § 1595, Defendant Sequoia Capital Operations, LLC is civilly liable to Plaintiff because it knowingly benefited from participation in a venture that it knew or should have known engaged in trafficking.

9. Damages
Plaintiff seeks:
• compensatory damages;
• punitive damages;
• restitution and disgorgement;
• attorneys' fees and costs;
• prejudgment interest at 10% compounded annually from May 23, 2014;
• such other and further relief as the Court deems just and proper.

**COUNT TWO**
**SEXUAL ASSAULT, SEXUAL BATTERY, AND RAPE**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**
**Plaintiff hereby incorporates by reference all prior paragraphs as if fully set forth herein.**

I. Jurisdiction and Applicable Law
This claim is brought under the Trafficking Victims Protection Reauthorization Act (TVPRA), including civil liability provisions under 18 U.S.C. §§ 1591 and 1595, which impose liability on persons or entities that knowingly benefit from participation in a trafficking venture.
This claim is further supported by overlapping federal, state, provincial, and international human rights instruments, including but not limited to:
• 18 U.S.C. § 2241 (Aggravated Sexual Abuse)
• 18 U.S.C. § 2242 (Sexual Abuse by Threat or Incapacitation)
• 18 U.S.C. § 242 (Deprivation of Rights under Color of Law)
• 28 U.S.C. § 1350 (Alien Tort Statute)

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1350, and 1367.
Jurisdiction is also invoked under the doctrine of universal jurisdiction as recognized in:

- The Palermo Protocol to Prevent, Suppress and Punish Trafficking in Persons
- The Convention Against Torture (CAT)
- The Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW)
- The Universal Declaration of Human Rights (UDHR), Article 5
- The International Covenant on Civil and Political Rights (ICCPR)
- Filártiga v. Peña-Irala
- Sosa v. Alvarez-Machain

II. Multistate and International Factual Predicate
A. Texas Jurisdiction
Plaintiff was trafficked into and through Texas, particularly Houston and Dallas, where sexual violence, grooming, and coercion were executed.
Texas law provides no statute of limitations for adult survivors of sexual assault pursuant to Tex. Civ. Prac. & Rem. Code § 16.0045.

B. California Jurisdiction
The most severe rapes, assaults, and coercive captivity occurred on properties controlled by Michael Goguen in California, where Plaintiff was held under surveillance and subjected to repeated sexual battery.
These acts occurred while Goguen was acting as a senior partner of Defendant Sequoia Capital and using financial resources and infrastructure associated with that position.

C. New York Jurisdiction
Plaintiff was trafficked into New York, where she was subjected to continued exploitation and retaliation through business and legal networks associated with Goguen and the venture that financially benefited Defendant Sequoia Capital.

D. Canada / Ontario Jurisdiction
Plaintiff's captivity and exploitation extended to Canada, where financial structures and shell entities connected to Goguen and associated enterprise actors facilitated cross-border exploitation and retaliation.
These claims are also consistent with principles recognized in
Doe v. Bennett and the protections guaranteed under the Canadian Charter of Rights and Freedoms §§ 7, 12, and 15.

III. Factual Allegations

The acts described herein occurred across multiple jurisdictions, including Colorado, and formed part of a continuous pattern of sexual exploitation, coercion, and trafficking conducted by

Michael Lewis Goguen within the enterprise that financially benefited Defendant Sequoia Capital Operations, LLC.

Michael Lewis Goguen, while acting within the venture that financially benefited Defendant Sequoia Capital Operations, LLC, engaged in systematic and prolonged sexual violence against Plaintiff, including:
• repeated vaginal and anal rape, often while Plaintiff was drugged or incapacitated;
• forcible sexual penetration resulting in catastrophic bodily injury including a seven-inch anal tear requiring emergency surgery;
• sexual assault conducted while Plaintiff was under surveillance and threats of death or permanent captivity;
• administration of Rohypnol and other incapacitating agents;
• non-consensual exposure to high-risk HPV and other sexually transmitted infections;
• the use of private security personnel, surveillance technologies, coercive contracts, and financial deprivation to compel Plaintiff's silence and obedience.
These acts were not isolated incidents but formed part of a systematic pattern of sexual violence carried out over years within the trafficking enterprise described in this Complaint.
Defendant Sequoia Capital knowingly benefited from and enabled this enterprise through its partnership relationship with Goguen and the financial and institutional infrastructure associated with his role.

IV. Legal Claims and Harms
The conduct described above constitutes:
• Sexual assault and battery under the tort laws of Texas, California, New York, and Ontario;
• Aggravated sexual abuse under 18 U.S.C. §§ 2241 and 2242;
• False imprisonment and intentional infliction of emotional distress;
• Violations of bodily integrity and fundamental human rights.
Under the civil liability provisions of the TVPRA, Defendant Sequoia Capital is liable because it knowingly benefited from participation in a venture engaged in trafficking and sexual exploitation.
The abuse inflicted upon Plaintiff was compounded by coordinated retaliation and concealment efforts that deprived Plaintiff of access to justice.

V. Injuries
As a direct result of the acts described herein, Plaintiff has suffered and continues to suffer:
• permanent internal injuries and reproductive damage;
• chronic pelvic and spinal injuries;
• Complex Post-Traumatic Stress Disorder and severe psychological trauma;
• neurocognitive impairments resulting from sustained abuse;
• loss of safety, shelter, livelihood, and reputation;
• deprivation of access to justice through intimidation and surveillance.

VI. Relief Sought
Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC for:
• General damages: $193,577,054.22
• Special damages: $10,000,000.00
• Loss of earnings: $10,000,000.00
• Punitive damages: not less than $500,000,000.00
• Prejudgment interest at 10% compounded annually from May 23, 2014
• Costs of suit, including attorneys' fees and expert costs.
Equitable and Declaratory Relief
Plaintiff further seeks:
• a permanent injunction prohibiting surveillance, intimidation, or retaliation by Defendant or its agents;
• declaratory judgment affirming violations of U.S., Canadian, and international human rights law;
• injunction barring enforcement of any settlements or judgments obtained through coercion or fraud;
• any further restorative relief the Court deems just and proper under principles of equity and universal jurisdiction.

**COUNT THREE**
**TORTURE, CRUEL, INHUMAN, AND DEGRADING TREATMENT**

1. Incorporation by Reference
Plaintiff Amber Doe realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.
The acts described in the factual allegations form part of a sustained trafficking enterprise in which Plaintiff was subjected to repeated physical, sexual, and psychological abuse.

2. Legal Basis
The conduct described herein constitutes torture, cruel and inhuman treatment, and extreme abuse under civil law.
The conduct described herein also violates universally recognized prohibitions against torture reflected in:
• The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)
• The Universal Declaration of Human Rights
• The International Covenant on Civil and Political Rights
These norms are widely recognized as fundamental principles prohibiting torture and severe abuse.

3. Extreme and Outrageous Conduct

Plaintiff was subjected to severe physical and psychological abuse by Michael Lewis Goguen and individuals acting within the trafficking venture described in this Complaint, including but not limited to:

- repeated violent sexual assaults causing permanent bodily injury;
- coercive confinement and surveillance;
- administration of intoxicating substances to incapacitate Plaintiff;
- physical and psychological domination designed to break Plaintiff's will;
- threats of death, retaliation, and continued captivity;
- systematic humiliation, degradation, and intimidation.

These acts were deliberate, sustained, and carried out with the intent to dominate, control, and silence Plaintiff.

4. Prolonged Pattern of Abuse

The abuse was not isolated. It formed part of a prolonged pattern of exploitation in which Plaintiff was subjected to repeated acts of violence and coercion over a period of years.
The abuse occurred in multiple locations and jurisdictions and was enabled by the financial resources, institutional backing, and enterprise infrastructure associated with Defendant Sequoia Capital through its partner Michael Goguen and the venture described in this Complaint.

5. Participation of the Defendant

Defendant Sequoia Capital Operations, LLC, acting through its partners, agents, attorneys, and affiliated actors, facilitated and enabled the torture and abuse by:

- providing financial resources that supported Goguen and the trafficking venture;
- enabling the infrastructure that allowed the exploitation to continue;
- concealing evidence and suppressing disclosure of the abuse;
- financing legal strategies designed to silence Plaintiff and prevent exposure of the misconduct.

Through these actions, Sequoia Capital knowingly enabled the conduct that resulted in Plaintiff's torture and severe abuse.

6. Severe Harm to Plaintiff

As a direct result of the conduct described above, Plaintiff suffered severe and lasting injuries, including:

- permanent physical injuries;
- chronic pain and medical complications;
- Complex Post-Traumatic Stress Disorder;
- severe psychological trauma;
- loss of safety, housing, income, and personal security.

The trauma inflicted on Plaintiff has had lifelong consequences.

7. Civil Liability

The conduct described herein constitutes:

• torture and cruel treatment;
• intentional infliction of severe emotional distress;
• aggravated assault and battery;
• extreme and outrageous conduct exceeding all bounds tolerated by a civilized society.

Defendant Sequoia Capital Operations, LLC is liable because it knowingly enabled and financially benefited from the venture within which these acts occurred.

8. Damages

Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC for:
• compensatory damages;
• punitive damages sufficient to punish and deter such conduct;
• prejudgment interest at 10% compounded annually from May 23, 2014;
• attorneys' fees and costs where permitted by law;
• any additional relief the Court deems just and proper.

**COUNT FOUR**
**CIVIL RACKETEERING (RICO) AND TRANSNATIONAL ENTERPRISE**
**(18 U.S.C. §§ 1961–1968)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference

Plaintiff Amber Doe realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Jurisdiction and Legal Basis

This claim arises under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act.

This Court has jurisdiction pursuant to:
• 28 U.S.C. §1331 (federal question jurisdiction)
• 18 U.S.C. §1964(c) (civil RICO damages)
• 28 U.S.C. §1367 (supplemental jurisdiction)

The racketeering scheme also implicates violations of fundamental human rights norms recognized in international instruments including:
• The Palermo Protocol to Prevent, Suppress and Punish Trafficking in Persons
• The Convention Against Torture
• The Convention on the Elimination of All Forms of Discrimination Against Women
• The Universal Declaration of Human Rights

3. The RICO Enterprise

At all relevant times, an association-in-fact enterprise existed within the meaning of 18 U.S.C. §1961(4).
The enterprise consisted of a network of individuals and entities including:
• Michael Lewis Goguen
• attorneys and law firms retained to protect Goguen and suppress victims
• private investigators and security operatives
• shell corporations and financial intermediaries
• financial channels used to move and conceal funds
The enterprise operated with a common unlawful purpose:
• to facilitate and conceal sexual exploitation and trafficking;
• to protect perpetrators from accountability;
• to suppress victims through intimidation and litigation abuse;
• to preserve the financial and reputational interests of Sequoia Capital.
This enterprise functioned as a continuing unit with relationships among its participants and a shared criminal objective.

4. Conduct of the Enterprise by Defendant
Defendant Sequoia Capital Operations, LLC conducted and participated in the affairs of the enterprise through its partner Michael Lewis Goguen, who used the authority, resources, and infrastructure associated with Sequoia Capital to facilitate the exploitation described in this Complaint.
Sequoia Capital knowingly benefited from Goguen's activities and continued to provide financial support and institutional protection despite repeated complaints by victims.
Sequoia Capital further financed legal strategies and investigative operations designed to silence Plaintiff and conceal the enterprise's activities.

Additional Factual Allegations Demonstrating Sequoia's Control, Direction, and Participation
Plaintiff alleges the following specific facts demonstrating that Defendant Sequoia Capital Operations, LLC participated in the operation and management of the enterprise and directed or knowingly coordinated the conduct described herein:
In litigation pending in Orange County, California, Plaintiff filed a cross-complaint naming, among others, Sequoia Capital.
Following the naming of Sequoia Capital in that action, Quinn Emanuel Urquhart & Sullivan LLP—which had previously acted in matters involving Michael Goguen and related parties—appeared on behalf of Sequoia Capital.
This continuity of legal representation between Goguen and Sequoia Capital demonstrates coordination and supports a reasonable inference that Sequoia Capital directed, authorized, or knowingly participated in a unified legal strategy.
In parallel proceedings in Ontario, Canada, Lenczner Slaght LLP, previously associated with Goguen-related litigation and enforcement proceedings, including matters connected to a Mareva injunction, appeared on behalf of Sequoia Capital.

The use of overlapping counsel across jurisdictions, including the United States and Canada, evidences an organized and coordinated enterprise operating across borders, with Sequoia Capital exercising control over legal strategy and enforcement mechanisms.
In the Orange County proceedings, Judge Nico Dourbetas ordered Plaintiff to post a bond in the amount of $50,000 within 30 days as a condition of proceeding.
Plaintiff alleges that this bond requirement was imposed under circumstances in which Defendant and its agents knew or reasonably should have known that Plaintiff lacked the financial ability to comply.
The foreseeable and actual consequence of this order was the dismissal of Plaintiff's claims, thereby depriving Plaintiff of access to judicial remedies.
Plaintiff further alleges that the imposition and enforcement of such financial barriers formed part of a broader pattern of conduct, including coordinated litigation and financial pressure, that impaired Plaintiff's ability to obtain relief, secure resources, and access medical care.
These facts, taken together, support a plausible and reasonable inference that Sequoia Capital directed, controlled, ratified, or knowingly participated in the operation of the enterprise, including its litigation and suppression strategies.

5. Pattern of Racketeering Activity
Defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).
Predicate acts included, but are not limited to:
• Sex trafficking in violation of 18 U.S.C. §1591
• Money laundering in violation of 18 U.S.C. §§1956–1957
• Witness tampering in violation of 18 U.S.C. §1512
• Retaliation against witnesses in violation of 18 U.S.C. §1513
• Interstate travel in aid of racketeering in violation of 18 U.S.C. §1952
• Mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343
These acts occurred repeatedly over a period of years and were related by their common purpose of maintaining the trafficking enterprise and suppressing Plaintiff's claims.

6. Obstruction and Retaliation
As part of the racketeering scheme, Defendant financed and supported actions intended to obstruct justice and silence Plaintiff, including:
• coercing Plaintiff into a settlement agreement designed to suppress disclosure of abuse;
• financing extensive litigation campaigns against Plaintiff;
• engaging investigators and agents to monitor and intimidate Plaintiff;
• interfering with Plaintiff's ability to retain legal counsel and pursue legal remedies.
These acts were undertaken to preserve the enterprise and prevent exposure of its activities.

7. Injury to Plaintiff

As a direct and proximate result of Defendant's racketeering activity, Plaintiff suffered injury to her person and property, including:
• severe physical and psychological harm resulting from exploitation and abuse;
• loss of income, assets, and financial stability;
• destruction of professional opportunities and reputation;
• prolonged legal harassment and obstruction of access to justice.
These injuries constitute compensable harm under 18 U.S.C. §1964(c).

8. Damages
Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC for:
• treble damages pursuant to 18 U.S.C. §1964(c)
• compensatory damages
• punitive damages
• prejudgment interest at 10% compounded annually from May 23, 2014
• costs of suit and attorneys' fees
• any additional relief the Court deems just and proper.

Important strategic observation
Your complaint now has three extremely powerful legal engines:
TVPA trafficking claim
Civil RICO
Breach of settlement agreement ($40M + interest)
That combination is rare and extremely dangerous for defendants, because:
TVPA provides direct liability
RICO provides treble damages
Contract provides hard documentary proof

**COUNT FIVE**
**RICO CONSPIRACY**
**(18 U.S.C. § 1962(d))**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Legal Basis
This claim arises under 18 U.S.C. §1962(d), which prohibits any person from conspiring to violate 18 U.S.C. §1962(c).
Jurisdiction is proper pursuant to:

- 28 U.S.C. §1331
- 18 U.S.C. §1964(c)
- 28 U.S.C. §1367

3. Existence of an Agreement
Plaintiff alleges that Defendant Sequoia Capital Operations, LLC knowingly entered into and participated in an agreement with members of the enterprise described in Count Four, including Michael Lewis Goguen and others, to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.
This agreement need not be formal or explicit and may be inferred from the conduct of the participants, their coordinated actions, and the structure of the enterprise.

4. Knowledge and Intent
Sequoia Capital knew the essential nature and scope of the enterprise and that its activities included unlawful conduct, including but not limited to:

- sex trafficking and exploitation;
- concealment of unlawful activity;
- financial transactions designed to obscure or facilitate such conduct;
- witness intimidation and retaliation;
- litigation-based suppression of victims.

Sequoia Capital agreed that members of the enterprise would commit at least two predicate acts of racketeering in furtherance of the enterprise's objectives.

5. Factual Allegations Supporting Agreement and Coordination
Plaintiff alleges the following facts supporting the existence of a conspiracy and Sequoia Capital's knowing participation:
After Plaintiff named Sequoia Capital in litigation in Orange County, California, Quinn Emanuel Urquhart & Sullivan LLP, previously involved in matters concerning Michael Goguen, appeared on behalf of Sequoia Capital.
In parallel proceedings in Ontario, Canada, Lenczner Slaght LLP, associated with Goguen-related enforcement proceedings, appeared on behalf of Sequoia Capital.
The use of overlapping counsel across jurisdictions supports a reasonable inference of coordinated strategy, shared objectives, and agreement among enterprise participants.
Sequoia Capital financed and supported litigation and investigative activities directed at Plaintiff, including actions that had the effect of suppressing claims and limiting Plaintiff's access to judicial remedies.
In Orange County proceedings, a $50,000 bond requirement was imposed that Plaintiff was unable to meet, resulting in dismissal of her claims, furthering the enterprise's objective of suppressing legal accountability.
These coordinated actions were not isolated, but formed part of a broader pattern of conduct designed to protect the enterprise and prevent exposure.

These coordinated actions, including the use of overlapping counsel, the imposition of litigation barriers, and the synchronized defense of enterprise participants, support a reasonable and plausible inference that Defendant Sequoia Capital Operations, LLC knowingly agreed to facilitate, protect, and further the objectives of the enterprise.

Sequoia Capital agreed, expressly or tacitly, that members of the enterprise would engage in a pattern of racketeering activity, including acts of trafficking, obstruction, financial coercion, and litigation-based suppression, in order to maintain control over Plaintiff and prevent exposure of the enterprise.

This agreement is further evidenced by the continuity of representation, shared legal strategy, and coordinated actions taken across multiple jurisdictions.

6. Overt Acts in Furtherance of the Conspiracy
In furtherance of the conspiracy, members of the enterprise committed overt acts, including:
• financing and facilitating interstate and international travel connected to unlawful conduct;
• engaging in financial transactions to conceal or distribute proceeds;
• coordinating legal representation across jurisdictions to defend and conceal enterprise activities;
• initiating and maintaining litigation strategies designed to intimidate, exhaust, or silence Plaintiff;
• interfering with Plaintiff's ability to obtain counsel, resources, and relief.
Sequoia Capital is liable for these acts because they were reasonably foreseeable and committed in furtherance of the conspiracy.

7. Injury to Plaintiff
As a direct and proximate result of Defendant's participation in the RICO conspiracy, Plaintiff suffered injury to her person and property, including:
• physical and psychological harm;
• loss of income, assets, and financial stability;
• legal costs and deprivation of access to courts;
• ongoing harm resulting from continued suppression and retaliation.

8. Damages
Pursuant to 18 U.S.C. §1964(c), Plaintiff seeks:
• treble damages;
• compensatory damages;
• costs of suit and attorneys' fees;
• prejudgment interest at 10% compounded annually from May 23, 2014;
• such other and further relief as the Court deems just and proper.

**COUNT SIX**
**FRAUD AND FRAUDULENT INDUCEMENT**
**(Common Law Fraud)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.
The allegations described throughout this Complaint detail a prolonged course of coercion, trafficking, intimidation, and litigation abuse carried out through and for the benefit of Defendant Sequoia Capital Operations, LLC.

2. Fraudulent Inducement of the Settlement Agreement
On or about May 23, 2014, Plaintiff was induced to execute a written settlement agreement that purported to resolve claims arising from the abuse and exploitation described in this Complaint. The settlement agreement provided for payment of Forty Million Dollars ($40,000,000) to Plaintiff.
Plaintiff alleges that the agreement was procured through fraud, coercion, and material misrepresentations made by Defendant Sequoia Capital Operations, LLC, acting through its partner Michael Lewis Goguen and through attorneys and agents retained by Sequoia Capital.

3. Material Misrepresentations
Defendant, through its agents and attorneys, made numerous false representations and omissions of material fact, including but not limited to:
• representing that the settlement agreement would be honored and the agreed compensation paid;
• representing that the agreement would provide Plaintiff safety and final resolution of disputes;
• representing that Plaintiff would be free from retaliation or further litigation.
These representations were false when made, and Defendant knew or recklessly disregarded their falsity.

4. Coercive Circumstances
Plaintiff was placed under extreme coercive circumstances at the time the agreement was executed, including:
• isolation from legal counsel;
• threats of retaliation and financial destruction;

• intimidation through investigators and surveillance;
• ongoing litigation pressure orchestrated by Defendant and its attorneys.
Defendant and its agents deliberately created these conditions in order to force Plaintiff into signing the agreement.

5. Intent to Deceive
Defendant made these misrepresentations with the intent that Plaintiff rely upon them and execute the settlement agreement.
At the time the agreement was presented, Defendant had no intention of honoring its obligations and instead intended to use the agreement as a mechanism to silence Plaintiff and prevent disclosure of the underlying misconduct.

6. Reasonable Reliance
Plaintiff reasonably relied upon Defendant's representations and executed the settlement agreement believing that:
• the promised payment would be made;
• the agreement would provide protection and closure;
• Defendant would not retaliate or pursue further legal harassment.
Plaintiff would not have entered the agreement absent these representations.

7. Subsequent Fraudulent Conduct
Following execution of the agreement, Defendant engaged in conduct demonstrating the fraudulent nature of the inducement, including:
• failing to honor the settlement obligations;
• financing extensive litigation against Plaintiff;
• interfering with Plaintiff's access to legal counsel;
• pursuing actions designed to destroy Plaintiff's financial stability and credibility.
These actions were consistent with Defendant's original fraudulent intent.

8. Damages
As a direct and proximate result of Defendant's fraud and fraudulent inducement, Plaintiff has suffered substantial damages, including:
• loss of the promised settlement funds;
• additional financial losses resulting from retaliatory litigation;
• emotional distress and psychological harm;
• further injury to reputation, livelihood, and personal security.

9. Relief Sought
Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC for:
• compensatory damages;
• punitive damages;
• rescission or other equitable relief as appropriate;

• prejudgment interest at 10% compounded annually from May 23, 2014;
• attorneys' fees and costs where permitted by law;
• any additional relief the Court deems just and proper.

**COUNT SEVEN**
**FRAUD UPON THE COURT**
**(Federal Common Law; Equitable Relief)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

I. Incorporation of Prior Allegations
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs, factual allegations, and causes of action as though fully set forth herein.
The facts alleged throughout this Complaint describe a prolonged and coordinated effort by Defendant Sequoia Capital Operations, LLC, acting through its partner Michael Lewis Goguen, retained attorneys, investigators, and agents, to corrupt judicial proceedings and prevent Plaintiff from obtaining legal redress.

II. Nature of the Fraud Upon the Court
Defendant Sequoia Capital Operations, LLC engaged in a deliberate and systematic scheme to corrupt judicial proceedings in multiple jurisdictions through fraud upon the court.
Fraud upon the court is a narrow but severe doctrine that applies where a party deliberately corrupts the judicial process itself through conduct that undermines the integrity of the tribunal.
The scheme described herein was designed to manipulate the judicial machinery and deprive Plaintiff of access to justice.
The fraudulent conduct occurred in litigation across multiple courts, including:
• California state courts;
• United States federal courts;
• Canadian courts and related proceedings.
The conduct described below was intended to ensure that Plaintiff could not obtain a fair hearing and that Defendant would evade accountability for the underlying misconduct described in this Complaint.

III. Elements of Fraud Upon the Court
Defendant, acting through its attorneys, agents, and enterprise participants, engaged in conduct constituting fraud upon the court, including but not limited to:
• submission of false declarations and misleading affidavits;
• filing motions and pleadings containing knowingly false representations;
• suppression of material evidence relevant to Plaintiff's claims;
• manipulation of judicial proceedings designed to prevent Plaintiff's claims from being heard on the merits;

• misuse of legal procedures to obtain rulings that were procured through deception rather than adjudication.
Such conduct constitutes a direct attack on the integrity of the judicial process itself.

IV. Scheme to Corrupt Judicial Proceedings
The fraudulent scheme included the use of litigation tactics designed to silence Plaintiff and obstruct judicial review, including:
• orchestrating litigation campaigns designed to financially exhaust Plaintiff;
• manipulating procedural rules to prevent Plaintiff from presenting evidence;
• initiating retaliatory proceedings intended to intimidate and silence Plaintiff;
• using legal proceedings as instruments of harassment rather than legitimate dispute resolution.
These actions were undertaken for the purpose of shielding Defendant from liability arising from the trafficking, abuse, and contractual breaches described in this Complaint.

V. Legal Basis for Relief
Fraud upon the court is a recognized basis for equitable relief under federal common law.
Courts possess inherent authority to vacate judgments and orders obtained through deliberate corruption of the judicial process.
See Hazel-Atlas Glass Co. v. Hartford-Empire Co..
When a party engages in a scheme that undermines the integrity of judicial proceedings, the court has both the power and the duty to remedy that corruption.

VI. Continuing Harm to Plaintiff
As a result of Defendant's fraudulent manipulation of judicial proceedings, Plaintiff continues to suffer substantial harm, including:
• ongoing enforcement of orders and rulings procured through fraud;
• obstruction of Plaintiff's ability to pursue legitimate legal claims;
• reputational and financial harm caused by proceedings tainted by deception.
Unless remedied, the fraudulent conduct described herein will continue to produce unjust legal consequences.

VII. Relief Sought
Plaintiff seeks equitable and declaratory relief against Defendant Sequoia Capital Operations, LLC as follows:
A. Declaratory Relief
A declaration that judicial rulings and orders obtained through fraud upon the court are void and without legal effect.
A declaration that Defendant's conduct violated Plaintiff's constitutional right of access to the courts.

B. Injunctive Relief
An order vacating judgments and orders obtained through fraud upon the court.

An order permanently enjoining Defendant from engaging in further litigation abuse or obstruction of Plaintiff's legal claims.

C. Further Relief
Plaintiff requests such additional equitable relief as the Court deems just and proper to restore the integrity of the judicial process and ensure Plaintiff's access to justice.

**COUNT EIGHT**
**CIVIL CONSPIRACY AND CONSPIRACY TO COMMIT FRAUD UPON THE COURT**
**(Federal Common Law; 28 U.S.C. §§ 1331, 1350, 1367; 18 U.S.C. § 1962(d))**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

I. Incorporation of Prior Allegations
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs and causes of action of this Complaint as though fully set forth herein.
The facts alleged throughout this Complaint describe a coordinated and sustained scheme carried out by Defendant Sequoia Capital Operations, LLC, acting through its partner Michael Lewis Goguen, retained attorneys, investigators, and agents, to traffic, exploit, silence, and legally destroy Plaintiff while shielding the enterprise from liability.

II. Nature of the Conspiracy
Defendant Sequoia Capital Operations, LLC entered into and participated in a deliberate and unlawful agreement with various agents, attorneys, investigators, financial intermediaries, and enterprise participants to accomplish the following objectives:
• facilitate and conceal the trafficking, sexual exploitation, and abuse of Plaintiff;
• obstruct justice and corrupt judicial proceedings to prevent exposure of the enterprise;
• silence Plaintiff through intimidation, litigation abuse, and economic coercion;
• deprive Plaintiff of access to courts, counsel, and legal remedies;
• seize or destroy Plaintiff's financial resources and property.
The conspiracy was transnational, coordinated, and sustained over many years, involving multiple actors operating under the financial and institutional protection of Sequoia Capital.

III. Agreement and Common Design
Defendant, through its agents and enterprise participants, knowingly agreed to pursue a common unlawful plan to protect Michael Goguen and the trafficking enterprise while suppressing Plaintiff's legal claims.
The agreement included coordination between financial actors, legal counsel, investigators, and other participants acting on behalf of Sequoia Capital.

The purpose of the conspiracy was to ensure that Plaintiff could not obtain meaningful legal relief for the abuses described in this Complaint.

IV. Overt Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, Defendant and its agents committed numerous overt acts, including but not limited to:

- facilitating and concealing trafficking and sexual exploitation;
- financing litigation campaigns designed to silence Plaintiff;
- submitting misleading pleadings, declarations, and motions in court proceedings;
- manipulating procedural mechanisms to prevent Plaintiff's claims from being heard;
- conducting surveillance, intimidation, and harassment directed at Plaintiff;
- interfering with Plaintiff's access to legal counsel and resources necessary to pursue her claims.

These acts were undertaken with the intent to preserve the enterprise and prevent exposure of its unlawful activities.

V. Conspiracy to Commit Fraud Upon the Court

As part of the conspiracy, Defendant and its agents engaged in conduct constituting fraud upon the court, including actions designed to corrupt the judicial process and prevent fair adjudication.

Fraud upon the court occurs where a party engages in a deliberate scheme to corrupt the judicial machinery itself.

The actions described herein included the use of litigation tactics intended not to resolve legitimate disputes but to manipulate and obstruct judicial proceedings.

Courts possess inherent authority to remedy such conduct and to vacate orders obtained through corruption of the judicial process.

See Hazel-Atlas Glass Co. v. Hartford-Empire Co..

VI. Legal Basis

This claim arises under:

- federal civil conspiracy doctrine;
- the civil provisions of the Racketeer Influenced and Corrupt Organizations Act;
- the civil remedy provisions of the Trafficking Victims Protection Act;
- federal common law prohibiting fraud upon the court.

This Court has jurisdiction under:

- 28 U.S.C. §1331 (federal question);
- 28 U.S.C. §1350 (Alien Tort Statute, for violations of customary international law);
- 28 U.S.C. §1367 (supplemental jurisdiction).

VII. Harm to Plaintiff

As a direct and proximate result of Defendant's conspiracy, Plaintiff has suffered severe harm, including:

- physical and psychological injuries resulting from trafficking and abuse;
- destruction of financial stability and personal assets;

• reputational harm and professional blacklisting;
• obstruction of access to courts and legal remedies;
• prolonged intimidation and threats to personal safety.
These injuries were the foreseeable and intended consequences of the conspiracy.

VIII. Damages and Relief
Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC as follows:
Compensatory Damages
• General damages: $193,577,054.22
• Special damages: $10,000,000
• Loss of earnings: $10,000,000
Statutory and Punitive Damages
• Treble damages under RICO where applicable
• Punitive damages sufficient to punish and deter such conduct
Equitable Relief
• vacatur of orders obtained through fraud upon the court;
• injunctive relief prohibiting further harassment or litigation abuse;
• equitable disgorgement and restitution of profits obtained through the enterprise.
Additional Relief
• prejudgment interest at 10% compounded annually from May 23, 2014;
• attorneys' fees and litigation costs;
• such further relief as the Court deems just and proper.

**COUNT TEN**
**BREACH OF WRITTEN SETTLEMENT AGREEMENT**
**(Enforcement of Contract)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Jurisdiction and Legal Basis
This claim arises under:
• 28 U.S.C. § 1332 (Diversity Jurisdiction);
• 28 U.S.C. § 1367 (Supplemental Jurisdiction);
• Applicable state contract law (including California and Delaware);
• 18 U.S.C. § 1595 (TVPA beneficiary liability);
• 18 U.S.C. § 1964(c) (Civil RICO damages framework, where applicable to financial recovery).

3. The Written Settlement Agreement
On or about May 23, 2014, Plaintiff entered into a written settlement agreement providing for $40,000,000 USD in compensation, payable in four (4) installments of $10,000,000 USD.
The agreement resolved claims arising from severe personal injury, including trafficking, sexual violence, and related harms.
The contract was:
• written, executed, and notarized;
• supported by consideration;
• definite in its payment obligations;
• partially performed by an initial $10,000,000 payment.

4. Sequoia Capital's Role and Liability
Defendant Sequoia Capital Operations, LLC is liable for the breach of the settlement agreement because:
• it acted through its partner and agent, Michael Lewis Goguen, in connection with the agreement;
• it participated in structuring, facilitating, and executing the settlement;
• it funded and controlled the legal and financial mechanisms surrounding the agreement;
• it knowingly benefited from the suppression of Plaintiff's claims through that agreement;
• it exercised control sufficient to incur liability as a contracting party, agent, joint obligor, or beneficiary who assumed performance obligations.
Sequoia's involvement was not passive — it was financially and operationally integrated into the transaction.

5. Plaintiff's Performance
Plaintiff performed her obligations under the agreement, including:
• executing the release contemplated by the contract;
• refraining from pursuing claims covered by the agreement;
• complying with the terms imposed upon her.

6. Breach
Defendant materially breached the settlement agreement by:
• failing to pay the remaining $30,000,000 USD owed under the contract;
• causing or permitting the reversal, seizure, or deprivation of the initial $10,000,000 payment;
• interfering with Plaintiff's ability to receive, retain, or benefit from the agreed compensation;
• refusing to honor the contractual payment obligations in full.
As a result, Plaintiff has received none of the benefit of the bargain.

7. Enforceability of the Contract
Plaintiff affirms the validity and enforceability of the contract and seeks its enforcement.

To the extent Defendant may assert defenses based on coercion, illegality, or related doctrines, Plaintiff invokes the doctrine of ratification and enforcement of financial obligation, and elects to:
• enforce the payment provisions of the agreement;
• recover the full contractual amount due;
• reject any attempt by Defendant to use alleged defects as a shield against payment.
Defendant cannot retain the benefit of the release while refusing to pay the consideration.

8. Damages
As a direct and proximate result of Defendant's breach, Plaintiff is entitled to:
• $40,000,000 USD in contractual damages;
• restitution of any amounts wrongfully clawed back or diverted;
• consequential damages resulting from non-payment;
• prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
• any additional damages proven at trial.

9. Equitable Principles
Equity independently requires enforcement because:
• Defendant obtained the benefit of Plaintiff's release;
• Defendant avoided litigation exposure through the agreement;
• Defendant cannot retain those benefits while refusing to perform.
This constitutes unjust retention of contractual benefit and supports full recovery.

10. Prayer for Relief
WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. Payment of $40,000,000 USD under the written settlement agreement;
b. Prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
c. Restitution and disgorgement of all amounts wrongfully withheld or reclaimed;
d. Additional compensatory damages resulting from the breach;
e. Costs of suit and attorneys' fees where permitted;
f. Such other and further relief as the Court deems just and proper.

**COUNT ELEVEN**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Contract Enforcement – Bad Faith Conduct)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Jurisdiction and Legal Basis
This claim arises under:
• 28 U.S.C. § 1332 (Diversity Jurisdiction);
• 28 U.S.C. § 1367 (Supplemental Jurisdiction);
• State common law governing the implied covenant of good faith and fair dealing (including California and Delaware law);
• 18 U.S.C. § 1595 (TVPA – beneficiary liability);
• 18 U.S.C. § 1964(c) (RICO damages framework, where applicable).

3. Existence of Implied Covenant
Every contract includes an implied covenant of good faith and fair dealing, which prohibits a party from acting in a manner that:
• deprives the other party of the benefits of the agreement;
• interferes with the other party's rights to receive contractual performance;
• exploits the contract to achieve an unjust or opportunistic result.
This covenant applies fully to the May 23, 2014 written settlement agreement.

4. Sequoia Capital's Obligations
As a participant in, beneficiary of, and controlling actor behind the settlement agreement, Defendant Sequoia Capital Operations, LLC owed Plaintiff a duty to:
• ensure that contractual payments were made in good faith;
• refrain from interfering with Plaintiff's ability to receive and retain those payments;
• refrain from using legal, financial, or institutional mechanisms to defeat the purpose of the agreement;
• act honestly and fairly in the execution and performance of the contract.

5. Bad Faith Conduct
Defendant breached the implied covenant of good faith and fair dealing through deliberate, coordinated bad faith conduct, including:
• structuring and participating in a settlement while intending not to honor the full payment obligations;
• causing, directing, or permitting the reversal, seizure, or nullification of funds paid to Plaintiff;
• using legal processes, financial mechanisms, and third-party actors to prevent Plaintiff from realizing the benefit of the contract;
• interfering with Plaintiff's enforcement rights and access to remedies;
• engaging in conduct designed to retain the benefit of the release while avoiding the corresponding payment obligations.

6. Deprivation of Contractual Benefit
Through its bad faith conduct, Defendant ensured that:
• Plaintiff did not receive the full $40,000,000 owed;
• Plaintiff did not retain the initial payment made under the agreement;
• Plaintiff was deprived of the central benefit of the bargain — financial compensation in exchange for release.
This constitutes a complete frustration of the contract's purpose.

7. Intentional and Opportunistic Misconduct
Defendant's conduct was not accidental or negligent.
It was:
• intentional;
• calculated;
• economically motivated;
• designed to secure the benefits of the agreement without performing its obligations.
Such conduct constitutes classic bad faith and warrants enhanced damages.

8. Resulting Harm
As a direct and proximate result of Defendant's breach of the implied covenant, Plaintiff has suffered:
• loss of the full contractual compensation;
• financial devastation and economic instability;
• loss of legal recourse and enforcement opportunities;
• severe emotional distress and ongoing harm;
• continued exposure to risk and retaliation resulting from non-performance.

9. Damages
Plaintiff is entitled to recover:
• the full $40,000,000 USD contractual amount;
• consequential damages resulting from Defendant's bad faith interference;
• prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
• punitive damages based on Defendant's willful and malicious conduct;
• any additional damages proven at trial.

10. Equitable Considerations
Equity further supports recovery because:
• Defendant obtained the benefit of Plaintiff's release;
• Defendant avoided liability through the agreement;
• Defendant then acted to prevent Plaintiff from receiving payment.
The law does not permit a party to engineer non-performance while retaining contractual benefits.

11. Prayer for Relief
WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. Recovery of the full contractual amount of $40,000,000 USD;
b. Prejudgment interest at 10% compounded annually from May 23, 2014;
c. Consequential damages resulting from Defendant's bad faith conduct;
d. Punitive damages sufficient to punish and deter such conduct;
e. Costs of suit and attorneys' fees where permitted;
f. Such other and further relief as the Court deems just and proper.

**COUNT TWELVE**
**UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE)**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Legal Basis
This claim arises under:
• Equity and common law of the United States, including principles reflected in the Restatement (Third) of Restitution and Unjust Enrichment;
• Applicable state law, including California and Delaware;
• 28 U.S.C. § 1367 (Supplemental Jurisdiction);
• 18 U.S.C. § 1595 (TVPA – beneficiary liability);
• General equitable principles prohibiting retention of benefits obtained through wrongful conduct.

3. Alternative Pleading
This Count is pled in the alternative.
Plaintiff's primary position is that the May 23, 2014 written settlement agreement is valid and enforceable, and that Defendant is liable for the full contractual amount.
However, to the extent Defendant disputes enforceability, equity independently requires restitution.

4. Benefit Conferred
Plaintiff conferred substantial and direct benefits upon Defendant Sequoia Capital Operations, LLC, including:

• the release and suppression of significant legal claims;
• avoidance of litigation exposure and public accountability;
• financial and reputational protection arising from the settlement structure;
• the economic value of resolving claims without full payment.

These benefits were real, measurable, and valuable.

5. Defendant's Knowledge and Acceptance

Defendant knowingly accepted and retained these benefits.

At all relevant times, Defendant:

• was aware of the existence and purpose of the settlement agreement;
• participated in or controlled the mechanisms through which the agreement was executed;
• understood that the benefits received were contingent upon payment to Plaintiff.

6. Inequitable Retention

Defendant's retention of these benefits is inequitable because:

• Defendant failed to pay the full contractual amount;
• Defendant caused or permitted the deprivation of funds intended for Plaintiff;
• Defendant retained the benefit of Plaintiff's release while withholding consideration;
• Defendant used its financial and institutional power to secure advantage without performance.

Equity does not permit a party to retain the benefit of a transaction while refusing to pay for it.

7. Unjust Enrichment

As a result of the foregoing, Defendant has been unjustly enriched at Plaintiff's expense by:

• retaining the value of released claims without paying full compensation;
• avoiding substantial financial liability;
• benefiting from a transaction that it failed to honor.

8. Resulting Harm

Plaintiff has suffered:

• loss of the full economic value of the agreement;
• financial devastation and deprivation of compensation;
• continued harm resulting from Defendant's retention of benefits;
• inequitable deprivation of rights and remedies.

9. Restitution and Disgorgement

Plaintiff is entitled to restitution, disgorgement, and equitable relief, including:

• recovery of the full value of benefits unjustly retained;
• disgorgement of any profits or advantages derived from the transaction;
• imposition of a constructive trust over funds or assets traceable to the unjust enrichment.

10. Damages

Plaintiff seeks:

• restitution in an amount not less than $40,000,000 USD;
• prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
• additional equitable and compensatory relief as determined at trial;
• costs of suit and attorneys' fees where permitted.

11. Equitable Principles
Equity independently mandates relief because:
• Defendant obtained substantial benefits from Plaintiff;
• Defendant failed to provide the promised consideration;
• retention of those benefits without payment would result in manifest injustice.

12. Prayer for Relief
WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. Restitution and disgorgement in an amount not less than $40,000,000 USD;
b. Prejudgment interest at 10% compounded annually from May 23, 2014;
c. Imposition of a constructive trust over improperly retained funds or assets;
d. Costs of suit and attorneys' fees where permitted;
e. Such other and further equitable relief as the Court deems just and proper.

**COUNT THIRTEEN**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Nature of the Claim
This cause of action arises from Defendant's extreme and outrageous conduct, undertaken with intent or reckless disregard for the probability of causing severe emotional distress to Plaintiff.

3. Legal Standard
To establish intentional infliction of emotional distress, Plaintiff must show:
extreme and outrageous conduct;
intent to cause, or reckless disregard of the probability of causing, emotional distress;
a causal connection between the conduct and the injury;
severe emotional distress.

See Howell v. New York Post Co..

4. Extreme and Outrageous Conduct
Defendant Sequoia Capital Operations, LLC, acting through its agents, financial control, and coordinated conduct, engaged in behavior that exceeds all bounds tolerated in a civilized society. Such conduct includes:
• knowingly facilitating and financially supporting a system that resulted in Plaintiff's prolonged exploitation and harm;
• structuring and enforcing financial and legal mechanisms that deprived Plaintiff of compensation owed to her;
• participating in or directing litigation strategies designed to silence, isolate, and overwhelm Plaintiff;
• using economic pressure, legal process, and institutional power to strip Plaintiff of access to resources, remedies, and stability;
• maintaining and benefiting from these conditions while aware of the severe impact on Plaintiff.
This conduct is extreme, intentional, and conscience-shocking.

5. Intent or Reckless Disregard
Defendant acted with:
• knowledge of the high probability that its conduct would cause severe emotional distress;
• reckless disregard for Plaintiff's well-being;
• conscious indifference to the consequences of its actions.
Defendant's conduct was not negligent — it was deliberate and economically motivated.

6. Causation
There is a direct causal connection between Defendant's conduct and Plaintiff's injuries.
Defendant's actions:
• deprived Plaintiff of financial security and legal recourse;
• prolonged and intensified Plaintiff's exposure to harm;
• prevented Plaintiff from obtaining relief and recovery;
• directly contributed to Plaintiff's psychological and emotional suffering.

7. Severe Emotional Distress
As a direct and proximate result of Defendant's conduct, Plaintiff has suffered severe emotional distress, including:
• chronic psychological trauma and emotional suffering;
• extreme anxiety, fear, and distress arising from ongoing instability;
• loss of sense of safety, security, and dignity;
• ongoing mental and emotional harm requiring treatment and support.
The severity of this distress is substantial, enduring, and foreseeable.

8. Damages

Plaintiff is entitled to recover:
- general damages for emotional distress in an amount to be determined at trial;
- special damages for treatment, care, and recovery needs;
- loss of earnings and economic opportunity resulting from Defendant's conduct;
- prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
- punitive damages sufficient to punish and deter such conduct.

9. Aggravating Factors
Defendant's conduct warrants enhanced damages because it:
- targeted a vulnerable individual;
- involved abuse of financial and institutional power;
- was sustained over time rather than isolated;
- was undertaken for financial gain.

10. Prayer for Relief
WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. General damages for severe emotional distress;
b. Special damages for medical, psychological, and related care;
c. Loss of earnings and economic damages;
d. Prejudgment interest at 10% compounded annually from May 23, 2014;
e. Punitive damages in an amount sufficient to punish and deter;
f. Costs of suit and attorneys' fees where permitted;
g. Such other and further relief as the Court deems just and proper.

**COUNT FOURTEEN**
**GROSS NEGLIGENCE AND WILLFUL / WANTON MISCONDUCT**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

1. Incorporation by Reference
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

2. Duty of Care Owed to Plaintiff
At all relevant times, Defendant Sequoia Capital Operations, LLC owed Plaintiff a duty of care arising from its role as the corporate entity that employed, empowered, financed, and protected

Michael Lewis Goguen while he used Sequoia's institutional platform, resources, and legal infrastructure in connection with the trafficking venture and related misconduct described in this Complaint.
That duty arose from, among other things:
• Sequoia's knowledge, actual or constructive, that Goguen posed a grave and foreseeable danger to women and girls, including Plaintiff;
• Sequoia's ability to supervise, control, discipline, or remove Goguen and to restrict the use of Sequoia resources, personnel, counsel, and funds;
• Sequoia's knowing participation in and benefit from a venture that created an unreasonable and extreme risk of catastrophic harm to Plaintiff;
• Sequoia's duty not to expose a known trafficking survivor to foreseeable further harm, retaliation, deprivation, and coercion.
Plaintiff, as a vulnerable survivor of trafficking, sexual violence, and coercive abuse, was owed at minimum ordinary care and, under the circumstances alleged, a heightened duty not to be further endangered by a powerful corporate actor with knowledge of the risks.

3. Grossly Negligent and Willful Conduct
Defendant breached its duties to Plaintiff in a manner constituting gross negligence, willful misconduct, wanton misconduct, and reckless indifference to Plaintiff's life, safety, bodily integrity, financial survival, and access to justice.
Sequoia's conduct included, but was not limited to:
a. Funding, Enabling, and Shielding a Dangerous Actor
Defendant knowingly allowed Goguen to continue operating with the prestige, access, and institutional support of Sequoia despite repeated warning signs, complaints, and the obvious foreseeability of severe harm.
b. Failure to Protect Against Foreseeable Harm
Defendant failed to take meaningful protective action despite having the power to intervene, restrict, investigate, supervise, or terminate the mechanisms by which Goguen continued to cause harm.
c. Facilitation Through Legal and Financial Infrastructure
Defendant provided or funded legal, financial, and institutional infrastructure that enabled continued exploitation, concealment, retaliation, and suppression of Plaintiff's claims.
d. Escalation Through Retaliatory Measures
Rather than mitigate harm, Defendant escalated it by participating in or funding litigation abuse, economic deprivation, obstruction of remedies, and other acts designed to wear Plaintiff down and destroy her ability to obtain safety or redress.
e. Conscious Disregard of Medical and Survival Risk
Defendant acted with reckless indifference to the likelihood that Plaintiff would suffer catastrophic personal consequences, including medical deprivation, financial ruin, ongoing trauma, and heightened danger to her life and safety.

4. Culpable State of Mind

Defendant's conduct was not accidental, technical, or merely careless.
It reflected:
• reckless disregard for foreseeable and catastrophic harm;
• conscious indifference to Plaintiff's safety and rights;
• willful blindness to ongoing abuse and retaliation;
• deliberate failure to implement corrective or protective measures despite notice and ability to act.
This misconduct was systemic and institutional, not isolated.

5. Direct and Proximate Harm
As a direct and proximate result of Defendant's gross negligence and willful/wanton misconduct, Plaintiff suffered severe and continuing harm, including:
• permanent physical injuries and chronic medical consequences;
• complex psychological injuries, including PTSD, severe anxiety, trauma, and emotional devastation;
• financial ruin, including loss of income, assets, housing stability, and professional standing;
• reputational destruction and blacklisting;
• ongoing exposure to danger, retaliation, and deprivation of basic security.
These harms were not only foreseeable — they were the predictable consequence of Defendant's misconduct.

6. Aggravating Circumstances
Defendant's conduct warrants enhanced damages because it involved:
• abuse of overwhelming corporate power;
• conscious disregard of repeated complaints and known risks;
• continued support of a partner whose conduct exposed Plaintiff to severe danger;
• use of financial and legal power not to protect, but to suppress, isolate, and exhaust the victim.
This is the type of misconduct for which ordinary compensatory damages alone are inadequate.

7. Damages
Plaintiff seeks judgment against Defendant Sequoia Capital Operations, LLC for:
• general damages for catastrophic personal injury, emotional distress, deprivation of liberty, and loss of dignity;
• special damages for past and future medical care, housing, relocation, security, and trauma recovery;
• loss of earnings and destruction of earning capacity;
• prejudgment interest at 10% per annum, compounded annually from May 23, 2014;
• attorneys' fees and costs where permitted by law;
• punitive and exemplary damages in an amount sufficient to punish and deter such institutional recklessness and conscious disregard.

8. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. General damages in an amount to be determined at trial;
b. Special damages in an amount to be determined at trial;
c. Loss of earnings and earning capacity in an amount to be determined at trial;
d. Prejudgment interest at 10% compounded annually from May 23, 2014;
e. Punitive and exemplary damages sufficient to punish and deter Defendant's misconduct;
f. Costs of suit and attorneys' fees where permitted;
g. Such other and further relief as the Court deems just and proper.

**COUNT FIFTEEN**
**CONSPIRACY TO CAUSE PLAINTIFF'S DEATH VIA DEPRIVATION OF MEDICAL TREATMENT, FINANCIAL RESOURCES, AND ACCESS TO CARE**
**AGAINST DEFENDANT**
**SEQUOIA CAPITAL OPERATIONS, LLC**

I. Incorporation of Prior Allegations
Plaintiff Amber Doe repeats, realleges, and incorporates by reference all preceding paragraphs and causes of action of this Complaint as though fully set forth herein.

II. Nature of the Claim
This Count arises from Defendant Sequoia Capital Operations, LLC's alleged participation in a deliberate and malicious campaign to deprive Plaintiff of access to the financial resources, legal remedies, stability, and medical treatment necessary for her survival.
Plaintiff alleges that Sequoia, acting through its partner Michael Lewis Goguen, retained counsel, agents, investigators, and associated enterprise participants, knowingly used financial, legal, and institutional mechanisms to create conditions of medical endangerment, deprivation, and escalating risk to Plaintiff's life and bodily integrity.
This Count is based on Sequoia's alleged knowing participation in a course of conduct designed to break Plaintiff physically, psychologically, financially, and legally, with foreseeable and potentially fatal consequences.

III. Legal Basis
This Count arises under:
• federal common law and supplemental state tort principles;
• 28 U.S.C. § 1367;
• 18 U.S.C. § 1595, to the extent the conduct forms part of retaliation and coercion connected to the trafficking venture;
• 18 U.S.C. § 1962(d), to the extent the conduct furthered the racketeering enterprise alleged

herein;
• general equitable and tort principles prohibiting deliberate interference with access to necessary care, survival resources, and legal protections.
Plaintiff further alleges that the conduct described herein violates fundamental norms protecting life, bodily security, and freedom from cruel and inhuman treatment.

IV. Factual Allegations
Plaintiff alleges that Sequoia Capital, directly and through persons acting on its behalf or for its protection, participated in a course of conduct intended to deprive Plaintiff of the means necessary to secure life-sustaining medical treatment and basic safety, including by:
• interfering with Plaintiff's access to funds and compensation needed for medical care;
• participating in or financing retaliatory litigation designed to financially exhaust Plaintiff;
• using legal and financial pressure to obstruct Plaintiff's ability to secure treatment, housing, and protection;
• prolonging and intensifying Plaintiff's vulnerability by blocking or undermining lawful remedies that would have restored access to care;
• maintaining pressure, intimidation, and instability despite knowledge of Plaintiff's fragile physical and psychological condition.
Plaintiff further alleges that this conduct did not occur in a vacuum, but as part of the broader enterprise described in this Complaint, whose purpose included silencing Plaintiff permanently.

V. Knowledge, Intent, and Foreseeability
Defendant knew or should have known that Plaintiff required medical care, financial stability, and secure access to treatment and survival resources.
Defendant further knew or should have known that:
• depriving Plaintiff of funds and legal remedies would foreseeably impair her access to care;
• prolonged instability, financial destruction, and medical deprivation would create a grave risk of catastrophic deterioration;
• continued retaliation against a trafficking survivor in a medically vulnerable state could produce life-threatening consequences.
Plaintiff alleges that Sequoia acted with at least reckless indifference, and in key respects with deliberate intent, to create or maintain conditions that endangered Plaintiff's life, liberty, bodily integrity, and survival.

VI. Conspiracy and Coordinated Conduct
Plaintiff alleges that Sequoia did not act alone, but in coordination with Goguen and other agents, attorneys, and enterprise participants, to carry out a sustained course of conduct whose foreseeable effect was to deprive Plaintiff of the means to survive safely and obtain treatment.
This coordinated conduct included:
• economic deprivation;
• legal obstruction;
• retaliatory pressure;

• interference with Plaintiff's ability to obtain meaningful redress;
• maintenance of conditions of fear, instability, and medical vulnerability.

Sequoia is liable because it knowingly joined, financed, benefited from, and failed to stop this coordinated course of conduct.

VII. Resulting Harm

As a direct and proximate result of Defendant's conduct, Plaintiff has suffered severe and ongoing harm, including:

• acute medical deterioration and heightened risk to life and health;
• physical suffering and worsening medical instability;
• severe emotional distress, terror, and psychological trauma;
• loss of access to shelter, security, and medically necessary support;
• continuing endangerment arising from Defendant's alleged efforts to silence and exhaust Plaintiff.

Plaintiff alleges that these harms were not incidental. They were the foreseeable consequence of the campaign described herein.

VIII. Civil Liability

Defendant Sequoia Capital Operations, LLC is liable because it knowingly engaged in, enabled, funded, ratified, or benefited from conduct that deprived Plaintiff of access to the funds, stability, protection, and care necessary to preserve her life and bodily security.

The law does not permit a powerful corporate actor to weaponize economic and legal force against a medically vulnerable trafficking survivor while disclaiming responsibility for the foreseeable human consequences.

IX. Damages

As a direct and proximate result of Defendant's conduct, Plaintiff seeks judgment for:

• general damages for pain, suffering, deprivation of bodily security, and emotional devastation;
• special damages for emergency medical care, housing, relocation, and restoration of access to treatment;
• loss of income and earning capacity;
• prejudgment interest at 10% compounded annually from May 23, 2014;
• punitive damages sufficient to punish and deter conduct of this severity;
• costs of suit and attorneys' fees where permitted by law.

X. Protective and Equitable Relief

Plaintiff further seeks:

• immediate injunctive relief prohibiting further retaliation, interference, or conduct that impairs her access to funds, safety, or medical care;
• equitable relief necessary to preserve Plaintiff's life, bodily security, and access to treatment;
• such declaratory and injunctive relief as the Court deems just and proper.

XI. Prayer for Relief
WHEREFORE, Plaintiff respectfully requests judgment against Defendant Sequoia Capital Operations, LLC as follows:
a. General damages in an amount to be determined at trial;
b. Special damages for medical, housing, relocation, security, and treatment needs;
c. Damages for lost income and earning capacity;
d. Prejudgment interest at 10% compounded annually from May 23, 2014;
e. Punitive damages sufficient to punish and deter;
f. Costs of suit and attorneys' fees where permitted;
g. Immediate and permanent injunctive relief necessary to preserve Plaintiff's life, safety, and access to care;
h. Such other and further relief as the Court deems just and proper.

# COUNT SIXTEEN: REFOULEMENT OF A TRAFFICKING SURVIVOR

## Against Sequoia Capital

*(8 U.S.C. § 1231(b)(3); Art. 33, UN Refugee Convention; ICCPR, Art. 14; CAT, Art. 3; Against All State and Institutional Defendants Who Returned, Transferred, or Channeled Plaintiff Into Corrupted Jurisdictions)*

Plaintiff re, alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

This cause of action is brought under the non, refoulement principle, recognized in both domestic statutory law (8 U.S.C. § 1231(b)(3)) and international treaty obligations binding on the United States (1951 Refugee Convention and 1967 Protocol; International Covenant on Civil and Political Rights ("ICCPR"), Art. 14; Convention Against Torture ("CAT"), Art. 3).

The principle of non, refoulement prohibits returning, transferring, or remanding a victim of persecution or torture to any forum where they face a substantial likelihood of renewed harm, retaliation, or denial of justice. This prohibition applies not only to physical deportation, but also to judicial transfers, removals, or dismissals that knowingly return a trafficking survivor to a hostile forum controlled by traffickers, corrupted judges, or state actors complicit in persecution.

### Factual Allegations of Refoulement

1. Federal courts including the Southern District of New York (Judge Laura Taylor Swain) and District of Columbia, Eastern District Of Pennsylvania Honorable Judge Paul S. Diamond Re: Amber Doe v. Sequoia Capital Operations LLC, et al., Case No. 2:25-cv-04734-PD by transfer orders issued in 2023–2025, have knowingly and deliberately remanded Plaintiff's trafficking claims back into the Central District of California, a forum Plaintiff has repeatedly pled is corrupted, bribed, and weaponized against her by trafficker Michael Goguen, Quinn Emanuel, and their judicial co, conspirators.

2. These courts acted with full awareness that California state courts had already declared Plaintiff a "vexatious litigant," denied all filings, enforced fraudulent judgments, and solicited her murder through collusive retaliation.

3. By compelling Plaintiff back into the very jurisdiction controlled by her traffickers and corrupted judges, Defendants engaged in judicial refoulement, functionally indistinguishable from deporting an asylum seeker back into the hands of persecutors.

4. Judge Swain's August 20, 2025 Transfer Order (Doe v. Sequoia Capital, 25, CV, 6169 (LTS)) explicitly cited prior California dismissals labeling Plaintiff "frivolous" and "vexatious," while ignoring the trafficking allegations. This order is paradigmatic refoulement: laundering fraudulent state court stigmas into federal proceedings to justify returning Plaintiff to persecution.

5. Refoulement is not limited to immigration contexts. Courts have applied its underlying due process and human rights principles to extradition, judicial transfers, and institutional practices where victims are knowingly sent into persecution. See *INS v. Cardoza, Fonseca*, 480 U.S. 421 (1987) (U.S. recognizes binding obligations under non, refoulement).

6. Plaintiff has repeatedly been denied fee waivers, TROs, e-filing rights, and access to judicial remedies in California. Federal judges are fully aware of these deprivations yet persist in transferring her filings there, thereby ensuring she is trapped in a closed, loop system of persecution with no neutral tribunal.

7. The challenged transfer pattern continued in 2026. On April 14, 2026, Judge Laura Taylor Swain ordered the transfer of Doe v. Sequoia Capital Operations LLC, et al., No. 26-cv-02912 (LTS), from the Southern District of New York to the Central District of California. The order relied on prior California dispositions and characterized the new action as substantially similar to earlier proceedings. It directed that no summons issue from the New York court. Plaintiff disputes the characterization of her claims and alleges that reliance on the challenged California dispositions perpetuated the denial of meaningful adjudication.

8. In a separate Southern District of New York action, No. 26-cv-03205 (JMF), Plaintiff paid the $405 filing fee by money order, processed on April 21, 2026. Judge Jesse M. Furman signed an order transferring that action to the Central District of California on April 28, 2026; the order was entered on April 29, 2026. Plaintiff alleges that, despite paying the filing fee and seeking issuance of summonses, she again lost the opportunity to pursue her claims in the New York forum.

9. Plaintiff sought appellate review and an emergency stay of the transfer in No. 26-cv-03205. On May 19, 2026, Furman denied the stay motion as frivolous. The transferred action was received in the Central District of California as No. 2:26-cv-05339. On May 22, 2026, Sequoia's counsel filed a notice identifying related cases assigned to Judge Maame Ewusi-Mensah Frimpong. Plaintiff alleges that this related-case filing furthered the funneling of her claims toward the same judicial proceedings and restrictive rulings she had challenged.

10. Plaintiff alleges that these successive transfers perpetuated a closed-loop system: prior California dismissals supplied the justification for returning new claims to California, while those same dispositions and filing restrictions impaired her ability to obtain relief there. Plaintiff contends that the process prevented meaningful consideration of her allegations concerning trafficking, rape, exploitation, physical injuries, retaliation, and alleged financial misconduct.

11. Plaintiff alleges that the resulting delay, expense, and procedural foreclosure aggravated her psychological trauma and depleted her very few resources needed for housing, medical treatment, and personal safety. She invokes the concept of judicial refoulement to describe the alleged return of her claims to a forum in which she contends protection and meaningful redress have repeatedly been denied. These allegations supplement her existing allegations of abuse of process, retaliation, and deprivation of access to an impartial tribunal.

12.

## Legal Basis

- Domestic Law: 8 U.S.C. § 1231(b)(3)(A) codifies the non, refoulement principle by prohibiting removal to any country where persecution is likely. Courts extending this principle must also prohibit judicial transfer to a persecutory jurisdiction when persecution is reasonably foreseeable.

- International Law:

- *1951 Refugee Convention & 1967 Protocol* , Art. 33(1): "No Contracting State shall expel or return ('refouler') a refugee… to the frontiers of territories where his life or freedom would be threatened."

- *Convention Against Torture* , Art. 3: prohibits expulsion or return to states where torture is a foreseeable risk.

- *ICCPR* , Art. 14 guarantees a right to a fair and impartial tribunal, which is violated when courts knowingly return a victim to hostile forums.

- Analogy in U.S. Jurisprudence: Courts recognize that even indirect acts (constructive deportations, coerced transfers, etc.) constitute refoulement where persecution is the foreseeable outcome. See *Khouzam v. Attorney General*, 549 F.3d 235 (3d Cir. 2008).

## Harm and Injury

As a direct and proximate result of judicial refoulement, Plaintiff has suffered and continues to suffer:

- Denial of access to a neutral tribunal;
- Continued enforcement of fraudulent judgments and gag orders leading to illegal imprisonment ;
- Escalating retaliation and deprivation of housing, medical care, and survival needs;
- Foreclosure of all legal remedies by channeling every filing back into corrupted jurisdictions;
- Psychological trauma equivalent to being forcibly returned to the custody of traffickers.

## PRAYER FOR RELIEF ON COUNT SIXTY, TWO

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare that judicial transfers and dismissals returning Plaintiff to corrupted jurisdictions constitute refoulement in violation of U.S. statutory law, constitutional guarantees, and binding international treaties;

b. Void and enjoin all transfer orders, including but not limited to Judge Swain's August 20, 2025 Transfer Order in *Doe v. Sequoia Capital*, 25, CV, 6169 (LTS);

c. Enjoin any further federal or state court orders that transfer, remand, or compel Plaintiff to litigate in the Central District of California or other proven corrupted jurisdictions;

d. Refer this matter to the U.S. Department of Justice, Civil Rights Division, and to the United Nations Special Rapporteurs on Trafficking in Persons and Judicial Independence, for investigation and protective intervention;

e. Award compensatory and punitive damages against all non, immune institutional actors and private conspirators who procured or enforced refoulement orders;

f. Grant any further relief this Court deems just, equitable, and necessary to prevent continued persecution through judicial refoulement, including international protective measures and monitoring.

# CLOSING STATEMENT

# VIII

(On Billionaire Exploitation, Judicial Collusion, and State Complicity)

I speak today as a survivor whose life was stolen at the age of fifteen and who has never stopped fighting for freedom. What I endured, and what continues to be inflicted upon me, is not simply personal tragedy,  it is systemic atrocity.

## I. PREMIUM TRAFFICKING VALUE

The billionaires who abused and exploited me paid traffickers the highest premiums to guarantee my compliance and captivity. I was treated as a commodity of exceptional value ,  "the highest earner," generating profits they had never seen before and have never seen since.
They purchased my silence and my body with sums so large that, even now, disgorgement of their unlawful purchase of a human would not make a dent in their fortunes. Yet for me, the consequences were annihilation of liberty, health, and dignity.

## II. CONTRACTUAL SILENCE AND LEGAL BETRAYAL

I never intended to speak publicly about what was done to me. I had an understanding with the Hells Angels: I would remain silent so long as they left me alone. That fragile peace was shattered not by traffickers, but by  Sequoia capital Michael Goguen and their " lawyers" at Quinn Emanuel, Wilson Sonsini, and Goodwin Procter, who forced me to fire my lawyer and submit to their fraudulent "agreement."

This was not contract; it was coercion. It was not representation; it was re, trafficking through the weaponization of law.

## III. JUDICIAL TRAFFICKING ENTERPRISE

What followed is unparalleled in American or Canadian law. No fewer than forty, six judges became instruments of my trafficking , issuing fabricated rulings, enforcing fraudulent contracts, and unjustly enriching themselves through bribes and favors tied to the avails of child sex slavery.

These judges acted not as neutral arbiters but as traffickers under color of law. Their rulings replicated the same captivity I had endured in strip clubs and brothels , only now enforced with gavels and orders rather than chains and fists.

## IV. STATE COMPLICITY AND ATTORNEY GENERAL'S ROLE

California Attorney General Rob Bonta has actively aided and abetted this criminal enterprise , ordering police to halt investigations, shielding judges from accountability, and facilitating cover, ups for his judicial allies.

Instead of protecting victims, the Attorney General has emboldened traffickers and their attorneys, creating a culture of impunity where crimes of bribery, obstruction, and malicious prosecution flourish.

## V. CHILD PROTECTION FAILURE

In Canada, when I first ran from traffickers, the police captured me before I could secure safety. I told a government social worker the truth of what was happening. Her response was not rescue, but betrayal: she sent me back to my abusers, claiming that otherwise I would become a "street child."

That decision was not protection. It was complicity. It ensured that I was thrust back into the hands of traffickers, left to suffer mutilation, rape, and exploitation at the hands of billionaires and organized crime.

## VI. ONGOING PERSECUTION

Today, I remain in danger. I have no safe shelter. I am denied medical care for injuries caused by these crimes. My siblings are denied access to their own assets. And still, judges orchestrate fake trials and malicious prosecutions designed to culminate in my wrongful incarceration and

inevitable death.
This is not law. This is persecution. This is trafficking extended by the judiciary itself.

## VII. SUPREME SEVERE CONDEMNATION

We, the people, do not need corrupt judges like Mamie Frimpong, Danny Chou, Stephanie Bowick, Nico Dourbetes, Steve Kim, Nina Shapyrestyn and Elizabeth Lee, who claims to train judges across the nation on how to approach victims of human trafficking but is in actual fact training them how to retraumatize victims and who claim immunity as license to commit crimes.
We, the people, do not need an Attorney General like Rob Bonta, who obstructs investigations to protect corrupt judges.
We, the people, do not need a Department of Justice that stands idle while lawyers commit felonies in plain sight.
We, the people, need a judiciary that is not bought, a bar that is not corrupt, and a state that is not complicit in the most inhumane crime on this planet.

## VIII. FINAL DECLARATION

There has never been a trafficked stripper like me , exploited to the highest premium, then silenced by a legal cartel of billionaires, attorneys, and judges.
There has never been a precedent in U.S. or Canadian law where over 100 judges collectively participated in trafficking a survivor for profit.
I have never committed a crime. Yet I am hunted, gagged, and persecuted by those sworn to uphold the law.
This is not justice. It is systemic debasement, and history will record it as a crime against humanity unless redressed now.

### ⚖️ Condemnation and Assertion of Rights

I have endured an additional twelve years of continued trafficking where judges and lawyers became my latest traffickers unjustly enriching themselves at the expense of my life health and safety, now laundered through judicial proceedings masquerading as law. The billionaires and law firms who trafficked me remain free, while I, the victim, am targeted for silencing, dispossession, and eventual death.

Canada cannot abdicate its role. The duty of protection is not optional. It is enshrined in the Charter, in the Palermo Protocol, in the Convention Against Torture, and in the ICCPR. Failure to act is a betrayal of every Canadian survivor of trafficking and every Canadian citizen who expects the state to defend them against foreign persecution.

I therefore declare:

- That judicial refoulement is a crime.
- That U.S. judges and lawyers engaged in my persecution are criminal actors under international law.
- That Canada must assert protective jurisdiction and enforce Magnitsky sanctions against these bad actors.
- That my safety, dignity, and survival are matters of national and international urgency.

This is not a request. This is a statement of law, fact, and principle. I will not be silenced. I will not be surrendered to my abusers by way of judicial trickery. I am a Canadian citizen, and I am entitled to protection.

⚖️ Statement ends here.

DEMAND FOR JURY TRIAL

IX.

Plaintiff Amber DOE, a Canadian citizen and survivor of cross-border human trafficking, judicial persecution, and systemic abuse, hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States Constitution (Seventh Amendment), 18 U.S.C. § 1595(b)(4) (TVPA civil jury rights), and applicable federal statutory and constitutional provisions.

This demand is made upon the following grounds:

1. The facts at issue involve grave allegations of:
    - Human trafficking;
    - Rape and sexual slavery;
    - Torture and cruel, inhuman, and degrading treatment;
    - Fraud upon domestic and foreign courts;
    - Racketeering enterprise activity under 18 U.S.C. §§ 1961–1968 (RICO);

- Obstruction of justice
- State-sponsored conspiracy to deny Plaintiff access to due process, equal protection, and constitutional rights under the U.S. Constitution, the Trafficking Victims Protection Act, and international human rights law.

2. These claims raise profound public questions concerning:
   - The abuse of the U.S. federal and state courts by private billionaires and complicit attorneys;
   - Systemic retaliation against a known survivor of human trafficking;
   - Corruption of judicial officers, regulatory bodies, law enforcement, and public officials in the United States and abroad.
3. Plaintiff asserts her inviolate right to have her claims adjudicated by a jury of her peers, as guaranteed under the Seventh Amendment to the U.S. Constitution and applicable statutes.
4. Given the magnitude of misconduct, scope of racketeering activity, state actor complicity, and the systemic obstruction of justice involved, trial by jury is necessary to ensure the integrity of the judicial process and public confidence in the rule of law.

WHEREFORE, Plaintiff demands that all triable issues of fact be determined by a jury in the U.S. District Court.



# PRAYER FOR RELIEF

# X.

Statement Regarding Relief Sought from State Actors and Judicial Officers

Plaintiff expressly reiterates and clarifies that no monetary damages are sought against any current or former judicial officer, government official, or state actor in any capacity. All such individuals are named solely in their official capacity for the limited purposes of obtaining declaratory, injunctive, and equitable relief to remedy ongoing constitutional violations, abuse of process, and deprivation of federally protected rights under 42 U.S.C. §§ 1983, 1985, and 1986, the U.S. Constitution, and international human rights law. This action does not seek personal liability or damages from any judge, government officer, or public official protected by judicial or sovereign immunity.

WHEREFORE, Plaintiff Amber Doe respectfully demands judgment against all Defendants, jointly and severally, as follows:

I. COMPENSATORY DAMAGES:

- General damages in the amount of $889,000,000.00 to $1,207,000,000.00 USD, including but not limited to:
    - Severe physical, psychological, emotional, reputational, and economic harm;
    - Loss of earnings, medical expenses, pain and suffering, loss of enjoyment of life, and lost business opportunities.
- Special damages for:
    - Out-of-pocket costs, medical care, relocation expenses, housing loss, personal security, therapeutic care, protective services, and related expenses.

II. CONTRACTUAL DAMAGES:

- Breach of the May 23, 2014 Settlement Agreement in the amount of $40,000,000.00 USD, plus 10% compound interest accruing from May 23, 2014;
- Total contractual damages including interest: $154,639,535.77 USD.

III. PREJUDGMENT INTEREST:

- 10% compound interest per annum on all compensatory, contractual, and special damages, accruing from May 23, 2014, to final judgment.

IV. STATUTORY TREBLE DAMAGES:

- Treble damages under:
  - The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c);
  - The Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1595;
  - Civil conspiracy, obstruction of justice, and related federal statutes;
- Not less than $252,000,000.00 USD.

V. PUNITIVE AND EXEMPLARY DAMAGES:

- Punitive damages in the amount of $500,000,000.00 USD, to punish and deter Defendants' willful, malicious, illegal wicked, reckless, and egregious misconduct.

VI. DECLARATORY RELIEF:

- Declaring that:
  - Defendants engaged in a coordinated transnational criminal enterprise involving human trafficking, judicial corruption, and obstruction of justice;
  - The foreign and domestic judgments obtained against Plaintiff are void, unenforceable, and obtained by extrinsic fraud;
  - Plaintiff is entitled to all protections, remedies, and recognition under the Trafficking Victims Protection Act, Civil RICO, U.S. Constitution, and international human rights conventions.

VII. PERMANENT INJUNCTIVE RELIEF:

- Enjoining defendants from:
  - Further retaliation, harassment, stalking, surveillance, or interference with Plaintiff's legal rights, safety, privacy, and survival;
  - Enforcing any judgments, orders, or legal instruments procured through fraud upon the court, judicial bribery, or coercion;
  - Requiring removal of all defamatory material and fraudulent judicial designations from all public and private records;
  - Ordering the production of all documents, records, files, subpoenas, surveillance reports, legal memoranda, and communications related to the Plaintiff.

VIII. RESTITUTION AND ACCOUNTING:

- Full disgorgement of all profits, fees, assets, and payments derived from:
  - Human trafficking activities;
  - Legal fees obtained through racketeering activity;
  - Bribes paid to judicial officers, public officials, or their proxies;
- Full forensic accounting of all financial and legal transactions involving Defendants' racketeering conduct.

IX. LEGAL COSTS AND FEES:

- Full reimbursement of:
  - All court costs, expert witness fees, protective security costs, and out-of-pocket litigation expenses;
  - Reasonable attorneys' fees pursuant to 18 U.S.C. § 1595, 18 U.S.C. § 1964(c), and other applicable laws;
  - Ongoing security protection, housing, and medical care to ensure Plaintiff's continued safety and survival.

X. EXPUNGEMENT AND VACATUR:

- Vacating and expunging all:

- ◦ Fraudulent judgments, orders, vexatious litigant designations, and retaliatory rulings obtained through fraud upon the court;
- ◦ Fraudulent legal filings in the United States, Canada, and international forums.

XI. ANY FURTHER RELIEF:

- Such further equitable, extraordinary, and injunctive relief as this Court may deem just, necessary, and proper to secure full justice, accountability, protection of Plaintiff's life, liberty, property, and to prevent ongoing violations of U.S. law, international law, and natural justice.

PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

SIGNED ON October 1, 2026

Amber Doe

S/ Amber Doe

In service of a better humanity
Pro Se


We the People
Article. I
HAVENLIGHT

Exhibit A – Audio Evidence (Google Drive)

Now I direct the court, the witnesses, the judges and the jury to some of my work.

https://drive.google.com/file/d/1jbdcAeEYiIlXwbx0GMTG5EQ8SHKfFeSX/view?usp=sharing

Exhibit B – Audio Evidence (Google Drive) Goguen admitting his crimes and abuse.

https://drive.google.com/file/d/1QCycxt5Rl1Z5Z6LtZFuHKeRt580-fyuh/view?usp=sharing

Exhibit C – FIRST CORRESPONDENCE FROM CANADIAN ATTORNEY GENRAL HONORABLE ARIF VIRANI

**From:** **Ministerial Correspondence Unit - Mailout** Ministerial.CorrespondenceUnit-Mailout@justice.gc.ca
**Subject:** Correspondence from the Minister of Justice and Attorney General of Canada
**Date:** April 2, 2024 at 11:50 AM
**To:** justiceandpeaceforamber@gmail.com

---

Dear Amber:

Thank you for your correspondence concerning human trafficking. Please excuse the delay in responding.

At the outset, please accept my heartfelt sympathy for the traumatic events you experienced as a child and for the difficulties that you continue to face as a result.

I understand why you have written and how distressing this situation has been for you. I hope you will understand that, as Minister of Justice and Attorney General of Canada, I cannot provide legal advice to members of the public or comment on a specific case. However, I can provide you with general information.

Victims of crime in Canada have access to a wide range of services and programs that can offer information, support, and local referrals. If you have not already done so, I encourage you to contact your local victim services unit for guidance and support that may be available to you. A resource option that may be of interest to you is the **Victim Services Directory**, an online database created by the Department of Justice Canada's Policy Centre for Victim Issues to help individuals locate services for victims of crime in their particular region.

You may also find it helpful to visit **Canada.ca/mental-health** to access mental health and substance use supports and services available both where you live and virtually. If you or someone you know is thinking about suicide, please call or text 9-8-8.

As you may know, responding to the needs of victims of crime is a shared responsibility between the federal, provincial, and territorial governments. While the federal government enacts criminal law and provides funding to the provinces, the administration of justice, which includes the investigation and prosecution of *Criminal Code* offences, the responsibility for court processes and procedures, and the provision of victim services, is the responsibility of the provincial governments. Therefore, you may wish to share your concerns with the Honourable Doug Downey, Attorney General of Ontario. Minister Downey can be reached at **attorneygeneral@ontario.ca**.

Allegations of criminal conduct should be reported to the local police in the jurisdiction where the incidents occurred; it will be for them to further investigate and lay charges where appropriate.

The *Criminal Code* contains six specific human trafficking offences that, in certain cases, are punishable by severe sentences of up to life imprisonment. These offences include trafficking in adults, child trafficking, materially benefitting from human trafficking, and withholding or destroying identity documents to facilitate this crime. In addition, the *Immigration and Refugee Protection Act* includes a human trafficking-specific offence, which applies where victims are brought into Canada. This offence has a maximum penalty of life imprisonment. Moreover, *An Act to amend the Criminal Code, the Youth Criminal Justice Act and other Acts and to make consequential amendments to other Acts* (former Bill C-75) received Royal Assent on June 21, 2019. This legislation amended the *Criminal Code* to make it easier to prove human trafficking offences and seize related proceeds of crime.

Our government is committed to ensuring a whole-of-government approach and comprehensive way forward to address human trafficking. In September 2019, the Government of Canada announced a National Strategy to Combat Human Trafficking, supported by an investment of $57.22 million over five years and $10.28 million per year ongoing. The National Strategy, which is led by Public Safety Canada in partnership with several federal departments including the Department of Justice Canada, puts in place a coordinated framework to guide the Government's anti-human trafficking efforts. The framework aims to empower victims and survivors, prevent these crimes from taking place, better protect those who are most vulnerable to trafficking, prosecute human traffickers, and embrace

protect those who are most vulnerable to trafficking, prosecute human traffickers, and embrace partnerships with the provinces and territories, as well as other organizations. For further details, you may wish to visit the **Public Safety Canada website**.

The federal government works closely with the provinces and territories to support victims of crime, including victims of human trafficking. Specifically, the Department's Victims Fund makes grants and contributions funding available to provincial and territorial governments, non-governmental organizations, and other eligible recipients for the creation and enhancement of services for victims of crime and to enhance the knowledge and capacity of those who work with victims of crime.

Please be assured that our government unequivocally denounces human trafficking and is committed to making communities safer for all Canadians.

Thank you again for writing and, once again, please accept my sympathies.

Sincerely,

The Honourable Arif Virani, P.C., M.P.
Minister of Justice and Attorney General of Canada